The People v. Vincente Sanchez.

CURREY, J., expressed no opinion.

---

## THE PEOPLE v. VINCENTE SANCHEZ.

24  17
149  261

ADJOURNMENT OF COURT.—If the Judge or Judges of a Court do not appear by noon of the first day of a term, and the Sheriff or Clerk, at noon, does not adjourn the Court until the next day, the term does not thereby expire; but the Judge or Judges can appear and open the Court at any time during the day, and the Sheriff or Clerk can legally at any time during the day, after noon, adjourn the Court until the next day.

CONSCIENTIOUS SCRUPLES OF JUROR GROUND OF CHALLENGE.—Where a juror, in a capital case, after being sworn to answer questions concerning his competency, says that he entertains such conscientious scruples as would preclude his finding the defendant guilty of an offence punishable with death, and the District Attorney challenges him on the ground of implied bias, the challenge should be allowed.

DYING DECLARATIONS AS EVIDENCE.—Before dying declarations are admitted in evidence, it should be conclusively shown that the declarant was at the point of death; that he was conscious of approaching dissolution, and had lost all hope of a recovery, and made the declaration under the full belief that he was about to die. The existence of such belief need not be proved, however, by the express statements of the declarant, but it may be shown from the circumstances that such belief actually existed.

ID.—The declarations of deceased persons in cases of homicide stand on the same footing as witnesses sworn in the case as to their admissibility, and are governed by the same rules in conducting the examination, except that in examining the declarant leading questions may be put to him, and he may even be urged with earnest and pressing solicitation—although by such a course the credibility of the declaration is impaired.

MURDER AND MANSLAUGHTER.—In case of mutual combat where a homicide is committed, in order to reduce the offence from murder to manslaughter, it must appear that the contest was waged on equal terms, and no undue advantage was sought or taken by the defendant; for if such was the case, malice may be inferred, and the killing amount to murder.

ID.—When two persons have a sudden quarrel, and after a sufficient time has elapsed for the blood to cool and passion to subside, go out to fight, and one of them kills the other, the killing will be murder and not manslaughter.

3

The People v. Vincente Sanchez.

INSTRUCTIONS TO A JURY.—No instruction should be given to a jury which is not predicated upon some theory, logically deducible from at least some portion of the testimony.

WHAT CONSTITUTES MURDER IN FIRST AND SECOND DEGREES.—In order to constitute murder in the first degree there must be something more than malicious or intentional killing. There must be killing by means of poison, lying in wait, or torture, or some other kind of killing different from that of poison, lying in wait, or torture, which is wilful, deliberate, and premeditated, or a killing which is committed in the perpetration or the attempt to perpetrate any arson, rape, robbery, or burglary. Every other kind of murder, which is murder at common law, is murder in the second degree.

APPEAL from the District Court, Third Judicial District, Santa Cruz County.

The facts are stated in the opinion of the Court.

*Skirm*, for Appellant.

The motion to set aside the indictment, and in arrest of judgment, were improperly overruled.

The Judges did not attend until 2 o'clock P. M., of the first day of the term, and the Court could not be legally opened after the hour of noon; consequently there was no commencement of the Court of Sessions, and no order for summoning a grand jury could be legally made. (Wood's Dig., Articles 1566, 2704, and 706; Bouvier's Law Dic., Title "Court," as to performance of some public act to constitute a Court; *Wicks* v. *Ludwig*, 9 Cal. 175.)

The dying declarations of deceased were improperly received.

The deceased showed that he still entertained a hope of life, by asking his physician as he was going away if he would return again. (1st Phil. on Ev. C. H. & E.'s Notes, 293; 1st Arch. Crim. Pr. 140, Note 2.)

Dying declarations are admissible only to show the direct transactions from which death results, and not to prove former transactions, opinions, or motives. (1st Phil. Ev. C. H. & E.'s Notes, 285-6-7; 1st Greenleaf on Ev. § 159; Wharton on Homicide, 307.)

*McCullough*, Attorney-General, for Respondent.

The Court was opened, if that be necessary, at either 9 A. M. or 2 P. M., on the day fixed by law for its meeting, and there had been no adjournment by Sheriff or any one before its meeting.   (Wood's Dig. 157, 158, §§ 84, 96; *Thomas* v. *Fogarty*, 19 Cal. 644.)

The dying declarations were properly admitted.   (1st Greenleaf on Ev. § 158; *People* v. *Ybarri*, 17 Cal. 168.)

To the question "what, then, did the prisoner shoot you for," the objection was rightly overruled.   (*Nelson* v. *State*, 7 Humphrey, 543.)

By the Court, SANDERSON, C. J.

The fifty-ninth section of the Act concerning Courts of justice and judicial officers, (Wood's Digest, 147,) appoints the days upon which the terms of the Courts of Sessions are to be held; and the ninety-fifth section of the same Act prescribes what shall be done by the Sheriff or Clerk, if the Judge or Judges of the Court do not appear on the day appointed for the commencement of the term.   The latter section reads as follows: "If no Judge attend on the day appointed for holding the Court, before noon, the Sheriff or Clerk shall adjourn the Court until the next day at ten o'clock; and if no Judge attend on that day before noon, the Sheriff or Clerk shall adjourn the Court until the following day; and so on from day to day for one week.   If no Judge attend for one week, the Sheriff or Clerk shall adjourn the Court for the term."   In the present case, Monday, the third day of February, A. D. 1862, was the day appointed for holding the Court, and on that day neither of the Judges appeared until the hour of two o'clock P. M., at which time they all appeared and opened Court for the transaction of business—the Clerk and Sheriff being present.   When directed by the County Judge "to open Court," the Sheriff replied "that he had done so at nine o'clock that morning."

Beyond this the opening of the Court was not proclaimed by the Sheriff. Neither the Clerk nor Sheriff had adjourned the Court as required by the ninety-fifth section above quoted. The Court made an order directing a Grand Jury to be summoned, which was accordingly done; and such further proceedings were had as resulted in an indictment against the prisoner for the crime of murder; upon which he was subsequently tried in the District Court of the Third Judicial District and convicted of murder in the first degree. Upon this state of facts, it is contended on the part of the prisoner, that the term of the Court of Sessions, at which the indictment was found, was not held in accordance with law, and all its proceedings were therefore *coram non judice* and void.

The presence of the Judges, or a competent number of them, and a Clerk, and the performance by the Judges of some public act indicative of a design on their part to exercise judicial functions at the time and place appointed by law, is all that is requisite to the legal existence of a Court. (Bacon's Abridgement, Title Courts.) Leaving out of view the ninety-fifth section of the Act concerning Courts and judicial officers, and this definition of a Court is fully satisfied by the facts and circumstances of the present case. The time appointed by law was the first Monday in February, A.D. 1862, and the place was the Court-house of the county— the Judges, Clerk, and Sheriff were all present on that day and at that place; and the command to " open Court" given to the Sheriff, whether obeyed by him or not, was a public act indicative of a design on the part of the Judges to perform the functions of a Court. The fifty-ninth section of the statute prescribes no particular hour at which the Court must convene, and it may therefore, so far as that section is concerned, convene at any time during the *day*. If there is any obligation resting upon the Judges to convene before noon, it is imposed by the ninety-fifth section of the statute; and hence the solution of the question under consideration must be found in the construction of that section.

In effect, counsel for the prisoner contend that, inasmuch as the Judges did not appear before noon, it became necessary, in order to prevent a loss of the term, for the Sheriff or Clerk to immediately adjourn the Court until the next day ; and neither of them having done so, the term had already expired by operation of law before the Judges appeared.

This is giving the section in question, we think, a constuction and effect not contemplated by the Legislature. To continue the term over until the next day, an adjournment —the Judges being absent—was doubtless necessary ; but it does not follow that the term was lost at noon, either because an adjournment was not had at that time, or because the Judges had failed to appear ; on the contrary, we are inclined to think the term would continue during the whole of that day from the very fact that it was not adjourned, and the Judges might lawfully meet and open Court at any time before its close.

In *Thomas* v. *Fogarty*, 19th Cal. 644, the late Supreme Court held that the object and purpose of this section was to prevent the loss of a term in case of the absence of the Judge ; and the learned Justice who delivered the opinion in that case might have added that such was its only object.

Leave this section out of the statute, and the loss of a term is the consequence of a failure on the part of the Judge to appear on the day appointed for holding the Court. (*The People* v. *Bradwell*, 2 Cowen, 445.) To provide against such a consequence was the obvious intention of the Legislature in making this section a part of the Act; yet under the construction contended for on the part of the prisoner, it is made to hasten rather than retard the consequence which it was designed to prevent, and to defeat rather than accomplish its purpose. Such a result could never have been intended; and while this section must be so construed as to give full force and effect to the intention of the Legislature, care must be taken not to extend its operation beyond the

accomplishment of that object. From what has been said, it follows that the term was not lost by the failure of the Judges to appear before noon, nor by the neglect of the Sheriff and Clerk to adjourn Court until the next day; that, admitting an adjournment was necessary to preserve the term until the next day, it was not lost by a failure to adjourn at noon, but continued until the close of the day appointed for its commencement, and the Judges could legally open Court at any time before the day expired. Had an adjournment taken place, it is doubtful whether the Judges could have legally held Court before the next day. It is suggested by the Attorney-General that in such a case the Judges would have the power to set aside the adjournment and proceed with the business of the term. And such may be the case; but upon this point it is unnecessary, for the purposes of the present case, to express an opinion. The motion to set aside the indictment and the motion in arrest of judgment were properly overruled by the Court below.

The next error assigned is the allowance of a challenge interposed by the District Attorney to one of the trial jurors, upon the ground of implied bias. This assignment is manifestly frivolous. The juror was asked "whether he entertained such conscientious scruples as would preclude his finding the defendant guilty of an offence punishable with death;" and his reply was that "he did." In such a case the statute expressly provides that "he shall neither be permitted nor compelled to serve as a juror."

It is further claimed by counsel for the prisoner, that the Court below erred in admitting the dying declarations of the deceased. These declarations were made to the attending physician, F. E. Bailey, on the day after the declarant was wounded, and two days before his death. The admission of the declarations was objected to upon the ground that no sufficient foundation had been laid for their introduction. Upon this point Dr. Bailey testified as follows: " I found him suffering with wounds in the face and neck, inflicted by large

The People *v.* Vincente Sanchez.

shot of the kind known as duck or goose shot. A number of shot had entered his mouth; several teeth were shot away, and his lower jawbone was fractured. There were wounds over the left lung, and two or three of the shot had penetrated the chest. * * * He was very low, but able to converse. I did not think he could recover. I told him he had no chance of recovery. He asked me how long I thought he would live. I replied that I could not positively tell. My own opinion was that he could not live long. He had sent for the priest, who had gone up with me when I went. The priest administered the consolations of religion to him; at least a part of the ceremonies had been performed before he talked to me about the wounding. It is the custom with that class of people (Mexican) to send for the priest before they do for the physician, when they think they are in danger. The ceremonies may have been closed after he told me about the wounding. He exhibited symptoms of approaching death, but lived, I think, two days afterward."

Then follow the declarations. At the close of the direct examination the witness said: "After I had been with him four or five hours I left. When I was going, he asked me if I would come back. I told him that I thought it would not be worth while."

On cross-examination Dr. Bailey said: "The deceased was two or three hours making the statement to which I have testified; he spoke in broken English, which I understood, and with much difficulty and pain; he spoke at intervals; he would converse for a little while and then rest."

In the case of *Rex* v. *Woodcock*, 2 Leach's Cr. Cases, 267, 566, the general principle on which this species of evidence is admitted was stated by Lord Chief Baron Eyre to be this: "That they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn and so awful is

considered by the law as creating an obligation equal to that which is imposed by a positive oath in a Court of justice." Speaking of the circumstances under which dying declarations are admitted in evidence, Greenleaf says: "It is essential to the admissibility of these declarations, and is a primary fact to be proved by the party offering them in evidence, that they were made under a sense of impending death; but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears in any mode that they were made under that sanction, whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind." (1 Greenleaf Ev. sec. 158.)

This species of testimony should always be received with the greatest caution, and too much care cannot be observed by the Court in scutinizing the primary facts upon which its admissibility is grounded. No person is entirely exempt from a disposition to excuse and justify his own conduct, or to inflict vengeance upon one at whose hands he has suffered a grievous wrong; and in the eye of the law this proclivity is presumed, in cases like the present, to be overcome and silenced only by the presence of almost immediate death. An undoubting belief existing in the mind of the declarant, at the time the declarations are made, that the finger of death is upon him, is indispensable to that sanction which the law exacts; and if it shall appear, in any mode, that there was a hope of recovery, however faint it may have been, still lingering in his breast, that sanction is not afforded, and his statement cannot be received. The existence of such belief, however, need not be proved by any express statement by the declarant to that effect; it is sufficient if it appears from any circumstance, or from all the circumstances of the case taken together, that such belief actually existed. The

character of his wounds—his suffering and pain—the opinion of the surgeon or other attendants as to his condition, if stated to him—his alarm and anxiety, if manifested—his final preparation for death, if any was made—his taking leave of friends—his seeking the consolations of religion and the last offices of the Church, if such was the case—are all circumstances which are frequently quite as satisfactory in determining the question of belief as any express statement on the part of the declarant. In the present case the wounds received by the deceased were evidently mortal. He was unable to converse except at intervals, and then with much difficulty and pain. The symptoms of approaching dissolution were manifest to the eye of his physician, and he could not have been wholly unconscious of their presence. In reply to his own question, he is assured by his physician, upon whose judgment all rely under such circumstances, that his wounds are mortal, and that he has no chance of recovery. The unequivocal manner in which that opinion was expressed must have extinguished all hope. He expresses no opinion himself, but accepts that of his physician as conclusive. He asks for and receives at the hands of his priestly adviser the consolations of religion. The solemn ceremonies and last rites of the Church, appointed for the dying only, were performed and administered at his request. It might well be inferred from all these circumstances, that the declarant believed himself to be lying at the point of death at the time these declarations were made, and we are not prepared to say that the conclusion to which the Court below arrived was not correct.

In giving the testimony touching these declarations, the witness Bailey stated that he asked the deceased "why Sanchez shot him?" Counsel for the prisoner objected to the witness stating what was said in response to this question, upon the ground "that dying declarations were admis-

sible only to show the direct transaction from which the death resulted, and not to prove former transactions, opinions, or motives." The Court overruled the objection, and this ruling is the next error assigned.

As to their admissibility, the declarations of deceased persons, in cases of homicide, stand upon the same footing as the testimony of a witness sworn in the case, and are governed by the same rules, except as to the manner of conducting the examination, which may be by leading questions, and even earnest and pressing solicitation, although by such a course their credibility is impaired. They must be confined to facts, and such as are pertinent and relevant to the issue, and not speak to distinct and separate transactions, or to matters of opinion or hearsay. But in this case the declarant was relating the circumstances of the shooting, which was the "direct transaction from which his death resulted," and the question asked him referred directly in terms to that transaction. It was not calculated to elicit matters foreign to the issue, as is conclusively shown by the answer, which was, in substance, that there had been a quarrel between them, and they were going out to settle it. But, even admitting the ruling of the Court to be erroneous, we are unable to perceive how the prisoner was prejudiced thereby. The tendency of the testimony elicited was to reduce the offence from murder of the first to murder of the second degree, and perhaps manslaughter, and consequently it was more damaging to the prosecution than to the defence. It at least follows that no reversible error was committed.

The next error assigned is the refusal of the Court to give certain instructions asked on behalf of the prisoner. The first instruction is in the following words: "When, upon sudden quarrel, two persons fight, and one of them kills the other, this is voluntary manslaughter; and so if they, upon such occasion, go out and fight in a field, for this is one continued act of passion."

This instruction seems to be founded upon the theory

that the killing was the result of mutual combat. It is doubtful whether such a theory is logically deducible from the evidence; but, however that may be, it is clear that the instruction was properly refused, for the obvious reason, even in view of that theory, that it is not law. It ignores entirely the doctrine that in case of mutual combat, in order to reduce the offence from murder to manslaughter, it must appear that the contest was waged upon equal terms, and no undue advantage was sought or taken by either side; for, if such was the case, malice may be inferred, and the killing amount to murder. The latter clause, which, it is presumed, was more especially intended to apply to the present case, is also erroneous, because it ignores the doctrine that such "going out to fight" must occur immediately after the quarrel; for if sufficient time elapse between the quarrel and the "going out to fight" to enable the blood to cool and passion to subside, the killing will be murder, and not manslaughter.

The next instruction refused by the Court is in the following language: "Under the indictment against the defendant, he may be found guilty of any offence the commission of which is necessarily included in that with which he is charged in the indictment; that is, he may be found guilty of murder in the first degree, of murder in the second degree, of manslaughter, of fighting a duel and killing his antagonist, and of excusable or justifiable homicide."

In determining this question of error it is unnecessary to decide whether, under an indictment for murder, a defendant may be found guilty "of fighting a duel and killing his antagonist," inasmuch as the action of the Court below must be sustained upon other and sufficient grounds. The instruction was properly overruled for several obvious reasons.

1. All of it, except that portion which relates to duelling and excusable or justifiable homicide, had already been given by the Court, and the refusal was accompanied by a statement to that effect.

2. The theory that the homicide in this case was the result of a duel has no foundation in the evidence. No instruction should be given to a jury which is not predicated upon some theory logically deducible from at least some portion of the testimony. Such instructions are only calculated to confuse and mislead the jury, and ought not to be given.

3. It announces for the first time in the history of criminal procedure, the startling doctrine that a defendant on trial for murder may be found guilty of excusable or justifiable homicide. Upon this branch of the instruction comment is unnecessary.

4. Numerous objections to the instructions given by the Court are next urged, most of which have more or less merit; and one of them is clearly fatal to the judgment in this case. The following definition of murder of the first degree is found in the charge: "Murder is divided by our law into two degrees—the first includes every unlawing killing of a human being done maliciously or intentionally."

At best this is but a lame definition of murder, and contains none of the characteristics which mark the distinction between murder of the first and murder of the second degree. In effect, the jury are told that every unlawful killing of a human being done maliciously is murder of the first degree, and every unlawful killing of a human being done intentionally is murder of the first degree. Neither of these propositions is true; for malice must and intent to kill may exist where the killing only amounts to murder of the second degree.

In order to constitute murder of the first degree there must be something more than a malicious or intentional killing. There must be a killing within one of the three classes of cases described in the statute as constituting murder of the first degree. There must be a killing by means of poison, lying in wait, or torture, or some other kind of killing different from that of poison, lying in wait, or torture, which is wilful, deliberate, and premeditated; or a killing

which is committed in the perpetration or the attempt to perpetrate any arson, rape, robbery, or burglary.

In dividing murder into two degrees, the Legislature intended to assign to the first, as deserving of greater punishment, all murders of a cruel and aggravated character; and to the second all other kinds of murder which are murder at common law; and to establish a test by which the degree of every case of murder may be readily ascertained. That test may be thus stated : Is the killing wilful, (that is to say, intentional,) deliberate, and premeditated? If it is, the case falls within the first, and if not, within the second degree. There are certain kinds of murder which carry with them conclusive evidence of premeditation. These the Legislature has enumerated in the statute, and has taken upon itself the responsibility of saying that they shall be deemed and held to be murder of the first degree. These cases are of two classes. First—Where the killing is perpetrated by means of poison, etc. Here the *means* used is held to be conclusive evidence of premeditation. The second is where the killing is done in the perpetration or attempt to perpetrate some one of the felonies enumerated in the statute. Here the *occasion* is made conclusive evidence of premeditation. Where the case comes within either of these classes, the test question—"Is the killing wilful, deliberate, and premeditated?"— is answered by the statute itself, and the jury have no option but to find the prisoner guilty in the first degree. Hence, so far as these two classes are concerned, all difficulty as to the question of degree is removed by the statute. But there is another and much larger class of cases included in the definition of murder in the first degree, which are of equal cruelty and aggravation with those enumerated, and which, owing to the different and countless forms which murder assumes, it is impossible to describe in the statute. In this class the Legislature leaves the jury to determine, from all the evidence before them, the degree of the crime, but prescribes, for the government of their deliberations, the same

The People *v.* Vincente Sanchez.

test which has been used by itself in determining the degree of the other two classes—to wit: the deliberate and preconceived intent to kill. Thus the three classes of cases which constitute murder of the first degree are made to stand upon the same principle.

It is only in the latter class of cases that any difficulty is experienced in drawing the distinction between murder of the first and murder of the second degree, and this difficulty is more apparent than real. The unlawful killing must be accompanied with a deliberate and clear intent to take life, in order to constitute murder of the first degree. The intent to kill must be the result of deliberate premeditation; it must be formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation. There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation, and premeditation on the part of the slayer; and if such is the case, the killing is murder of the first degree, no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing.

We have carefully read the entire charge of the Court, for the purpose of ascertaining whether this objection is cured in any other part; and although we find other attempts at definition and illustration, we are satisfied that the distinction between the two degrees of murder is nowhere drawn with that perspicuity which is necessary in order to render it distinct and clear to the comprehension of a jury. This leaves to us no option but to reverse the judgment and order a new trial.

Ordered accordingly.