## J. H. BINGHAM *v.* THE STATE.

1. ASSAULT WITH INTENT TO MURDER. — Arts. 611 and 612 of the Penal Code, which authorize a defendant, after laying certain predicates, to prove threats by the deceased, and the general character of the deceased as a violent or dangerous man, have direct reference to cases of murder; but assaults with intent to murder are within the purview and application of their provisions.

2. SAME — THREATS — GENERAL CHARACTER. — Defendant and one H., previously friends, engaged in a sudden *rencontre*, provoked by the defendant, which began with fisticuffs, but ended by the defendant shooting H., who was unarmed. There was evidence that H., during the difficulty, and before the shooting, told the bystanders to take the defendant away or he would hurt him badly, and there was a conflict of testimony as to whether he then manifested an apparent purpose to draw a weapon. On trial of

the defendant for assault with intent to murder, he was allowed to prove that the general character of H. was that of a dangerous man in difficulties, and that he was reputed to usually go armed; but defendant proposed to ask the witness whether he thought H. was a man likely to use weapons in a difficulty. *Held*, that the question was properly disallowed. In any view of the case, the inquiry as to character had already reached its limit.

3. Practice — Privilege of Counsel. — In regard to the latitude allowable to the argument of counsel to the jury, the presiding judge is vested with a large discretion, which will only be revised when obviously abused.

Appeal from the District Court of Collin. Tried below before the Hon. J. Bledsoe.

The conviction in this case was for an aggravated assault, for which the punishment assessed by the jury was a fine of $500. The indictment, however, was for an assault with intent to murder one John Hunter, on July 20, 1878, by shooting him with a pistol.

Hunter was the first witness introduced by the State. He had known Bingham, the defendant, for quite a number of years. On the day of the shooting, he first met him at the Parlor Saloon, in the town of McKinney, Collin County, and next at the printing-office, to which the witness went to get his paper. Again, between sunset and dark of the same day, witness saw the defendant standing at the store of Estes & Howell, talking with Estes. Witness was between fifteen and eighteen feet distant, leaning against a post on the sidewalk, when the defendant approached and gave him a slap on the breast, saying, "John, we have always been friends, but you belong to a low-down, thieving clique, and you know it." Witness told him he was a liar, or a d—d liar. He then struck witness, who struck him in return, when he struck at witness again, but missed him, and witness struck him a second time. He staggered from the last blow, got back, and drew his pistol with his right hand, when about eight feet from witness. Witness thought he then said to the defendant, "D—n you; don't shoot. I'm unarmed." Estes caught defendant's left

arm, and threw him from an upright position. Witness's back was then against a post about four and a half inches square; and as defendant cocked his pistol, witness jumped behind the post, thus moving a little farther from the defendant, who fired four times. At the first shot, Estes had jerked the defendant from an upright position; at the second, Estes had jerked him back against the door-sill, but it struck witness in the right thigh; at the third, witness had slightly changed his position, and was struck in the left thigh. After the third shot, the witness, feeling his leg weaken, thought he would fall, and was going away, and had moved from five to ten feet from the post, with his back towards the defendant, when the latter fired his fourth and last shot at him; but, it seems, he was not struck by it. After the third shot, witness said to the crowd, "D—n you, are you going to stand there and let him kill me?" Witness had no weapons about him that day; had a shot-gun at the Parlor Saloon. He was confined to his bed three or four days by the wounds, and it was seven or eight weeks before they healed up. Witness made no advance whatever on the defendant when the latter drew his pistol. A crowd of men were standing around when the difficulty occurred, but witness could name none but Estes.

On his cross-examination, witness said that, so far as he was concerned, the defendant's remark about their being good friends was true, and he had always regarded the defendant as a friend of his. When the defendant approached witness, his remark was not that witness belonged to a railroad clique; it was, "a low-down, thieving clique." Witness thought it was meant in a political sense. Witness disclaimed knowing Benton, who subsequently testified for the defence, but said that he might have talked with him at Newsome's store. Did not tell any one at Newsome's store that he struck the defendant the first blow; did not, immediately before the defendant fired, throw his hands behind his back, and say to the crowd,

" Take him away, or I will hurt him d—d bad." Witness could not say whether he threw his hand behind his back in changing his position at the post, but did not put his hand in his hip-pocket. Defendant was drinking; witness was not, but may have taken a drink or two. Witness had brought a civil suit for damages against the defendant, and had ceased to be friendly with him. During the difficulty, witness had nothing in his hands, except, perhaps, a cigar-holder, with which he had been smoking. After the defendant approached witness, there was just time enough for the exchange of words before the blows passed, and then the shooting commenced. It was all done in a very brief space of time.

Ben Estes, for the State, testified that he saw the difficulty between Hunter and the defendant, in July, 1878. It took place between the storehouse of Baum and that of Estes & Howell. The defendant was talking to witness, and Hunter was leaning against a post. Defendant left witness, went to Hunter, and said, "You belong to a G—d d—n thieving railroad ring," or " clique." Hunter said, "You are a G—d d—n liar." Defendant, with his right hand in the right-hand pocket of his pants, struck Hunter with his left hand. Hunter then struck the defendant. Witness saw the defendant draw his pistol from the right-hand pocket of his pants, in which he kept his hand all the time he was talking to Hunter. Immediately after the blows, they separated five or six feet, and then the defendant drew his pistol. Hunter said, " Men, do not let him shoot me ; I am not armed." Witness was twelve or fifteen feet from them when the pistol was drawn by the defendant, but caught him before he fired. His pistol was pointed towards Hunter, who moved to another post, and, as the witness thought, was behind it when the defendant fired his first shot, which, witness thought, did not strike Hunter. When defendant fired his fourth and last shot, Hunter was just leaving the post ; his right side, and not his back, was

then towards the defendant, and he had not gone more than a step from the post. Witness heard the defendant say nothing during the encounter, nor hear Hunter say any thing except, "Men, don't let him shoot me; I am not armed." From the time the defendant drew his pistol until he fired his first shot, Hunter did not change his position; but changed to the second post between the first and second shots.

Cross-examined, the witness stated that the defendant was drunk, and staggered; Hunter was sober. Witness thought he had a better view of the defendant than of Hunter, who was beyond the defendant from witness. Witness did not see Hunter make any demonstration of drawing a pistol, but would not swear that he did not. When Hunter struck the defendant, the latter staggered, and witness thought he would fall. When he started towards Hunter, his hand was in his pocket, and he kept it there until he drew his pistol. During the shooting, witness had hold of him, and pulled him to a sitting position on the pavement.

C. W. McKinney, for the State, concurred in most respects with the testimony of Estes, but not in all. He said that Hunter and the defendant first struck each other simultaneously, and that the defendant, when he first approached Hunter, and when he struck him, did not have his hands in his pockets, but put them in his pockets immediately after the blows were exchanged. Witness did not see Hunter make any demonstration as if to draw a weapon, nor see any thing in his hands. Hunter did not try to get to the defendant. Witness heard him say, before the first shot, "Don't let him shoot me; I am not armed."

On the testimony of these witnesses the State rested.

The first material witness for the defence was John Benton, who stated that the defendant's remark to Hunter was, "You belong to a railroad clique," or "ring;" to which Hunter replied, "You are a liar." Then they struck; witness could not tell which struck first. About that time

witness saw Hunter throw his hand behind him, under his coat, and witness stepped back behind the door. The defendant was rather between Hunter and witness, and was facing Hunter, who was facing witness. After the fuss, witness had a conversation with Hunter near the storehouse of Newsome & Son, in which, witness thought, Hunter said that he first struck the defendant. On his cross-examination, this witness said that no blows had passed when Hunter put his hand behind him.

J. Dalton, for the defence, stated that he was within three or four feet of Hunter, when the defendant turned to Hunter and said, "We have always been good friends, but you belong to a clique," or "ring." Hunter said, "You are a d—d liar." Estes grabbed the defendant. Hunter said, "Men, take him away;" ran his hand in his hip-pocket, and said, "Take him away, or I will hurt him, and hurt him d—d bad." On his cross-examination, this witness said that the defendant did not draw his pistol until Hunter put his hand in his pocket, and that they struck each other simultaneously. Hunter's face was towards the defendant when the last shot was fired. When the first was fired, the defendant was leaning over; at the second, he was half-way down; and was flat down when he fired the third.

P. S. Graves, for the defence, stated that he was some fifteen or twenty steps off, when the defendant approached and said something to Hunter, who said, "You are a liar." Defendant said, "You are a G—d d—d liar." Hunter then struck the defendant, who returned the blow with his left hand. Hunter struck back, and nearly knocked the defendant down, and the defendant then struck again. Hunter then jumped behind a post, and made a motion with his right hand to his left side, as if to draw a pistol. Estes caught the defendant, and Hunter said, "Take him away, or I will hurt him, and hurt him d—d bad." Witness heard some one say he was unarmed, but did not know who said it.

J. Littlejohn, for the defence, testified that he first saw Hunter leaning against a post; and the defendant, who had been drinking, was walking up and down the street, speaking of being bulldozed. After the blows passed between them, Hunter jumped to the post and put his right hand to his hip-pocket, and said, "Take him away; I will hurt him, and hurt him d—d bad." While shooting, the defendant was lying nearly down, and some one had hold of him.

Manning, for the defence, gave a version of the encounter almost identical with Littlejohn's.

Joe Cline, who appears to have been a clerk for Estes &. Howell, testifying for the defence, stated that the defendant came to the store door and said, "Joe, I have been cussing around with the railroad clique, and I cussed out my suspenders, and want a new pair." John Hunter passed down the street, and the defendant said, "There is one of them now." Defendant did not seem to be mad, but was talking bad, like a drunken man. Defendant bought the suspenders, talked awhile to Estes, and then turned to Hunter and said something about a clique or ring. Witness could not see which of them struck the first blow. After the blows, Hunter jumped back to a post, put his hand behind him as he did so, and said, as witness thought, "Take him away, or I will hurt him, and hurt him bad." At this juncture witness started back to the store; he expected shooting, and, thinking himself in range, concluded to get out of the way. Hunter was nearly facing witness, and the defendant between them, facing Hunter.

J. H. Lovejoy, for the defence, said he had known Hunter for twenty-five years. Hunter had the reputation of being a peaceable man, but was considered a dangerous man when in a difficulty. He had the reputation of generally going armed.

A. G. Cummins, for the defence, stated that he had known Hunter for fifteen years. Hunter bore the reputation of being a very dangerous man in rows, and of gener-

ally going armed. A bill of exceptions shows that the defence proposed to ask this witness the following question : "From your knowledge of Hunter's general reputation, do you think he would be likely, in a difficulty, to use a weapon?" To this question the county attorney objected, for want of proper form, because of irrelevancy, and because the inquiry was confined to Hunter's character when in a difficulty. The court sustained the objections, and the defence, reserving exception to the ruling, closed their evidence.

The State, in rebuttal, examined several witnesses, and among them Dr. Wiley, who, after stating that he examined Hunter's wounds, and found them slight, testified that he was in front of a neighboring drug-store while the shooting was going on, and heard the defendant, as he fired the second, third, and fourth shots, each time say, "See that."

M. Baum, for the State, testified that he knew Benton, who had testified for the defence ; that, when the first shot was fired, Benton was buying a hat in the rear end of witness's store, forty feet from the front-door.

The witnesses Estes and Hunter were recalled by the State, and repeated some of their testimony, which seemed to be in conflict with that of some of the witnesses for the defence.

The court below, in an elaborate and able charge, instructed the jury fully upon every phase of the case. The jury found the defendant guilty of an aggravated assault, and assessed against him a fine of $500. The court below refused a new trial, and the defendant appealed.

*R. Maltbie, R. DeArmond*, and *M. H. Garnett*, filed a very able brief for the appellant, directed mostly to questions of fact.

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J. The appellant was charged by indictment with an assault with intent to murder one John P. Hunter, in Collin County, on July 20, 1878. On the trial in the District Court, the accused was convicted of an aggravated assault, and fined $500; and from the judgment prosecutes this appeal.

The questions of importance arising upon the record, and discussed in the brief of the appellant, are presented in the first and fourth errors assigned, as follows: " 1. The court should have granted defendant a new trial, because the verdict of the jury is contrary to the evidence, in this: the evidence in behalf of defendant shows that, immediately before he assaulted Hunter with a pistol, the acts and declarations of Hunter were such as to reasonably induce defendant to believe that he was in immediate and imminent danger of death, or great bodily harm, at the hands of said Hunter; and because there was no reason why the jury should disregard said testimony. * * * 4. Because of error of the court in refusing to give instructions marked No. 1, at the instance of the defendant, because it reasonably appeared from the evidence that, immediately preceding the time that defendant assaulted Hunter with a pistol, from the acts and declarations of Hunter, he was about to draw and use a pistol upon the defendant; and it would make no difference in law whether Hunter then had a pistol or not."

In connection with the subject embraced in these assignments of error, a question is raised as to a ruling of the court upon the evidence. A bill of exceptions recites that the " defendant proved by the witness A. G. Cummins that he knew the general reputation and character of John P. Hunter, the prosecuting witness, in rows and difficulties; and then asked witness the following question: ' From your knowledge of Hunter's general reputation, do you think he would be likely, in a difficulty, to use a weapon?' The answer to which was objected to by the county attor-

ney, for the following reasons, to wit: 1st. The form in which said question was asked. 2d. The matter thus sought was irrelevant. 3d. Because said question confined the witness to his general character when in a difficulty; which objections were sustained by the court, and the answer to said question was not permitted to go in evidence before the jury.'' And to the ruling the defendant took a bill of exceptions.

In disposing of this question, it is deemed sufficient to say that, in considering the subject set out in the bill of exceptions, in connection with other portions of the testimony of the witness Cummins, and the testimony of other witnesses on the same subject, as set out in the statement of facts, we are of opinion that the accused had the benefit of all the testimony he was entitled to under the provisions of the Code. The language is this: '' In every instance when proof of threats has been made, it shall be competent to introduce evidence of the general character of the deceased. Such evidence shall extend only to an inquiry as to whether the deceased was a man of violent or dangerous character, or a man of kind and inoffensive disposition, or whether he was such a person as might reasonably be expected to execute a threat made.'' Penal Code, art. 612 (Pasc. Dig., art. 2270).

It will readily be seen that this provision of the Code relates to, and follows in immediate connection with, what is said on the subject of justifying homicide on the ground of threats, as follows: '' When a defendant, accused of murder, seeks to justify himself on the ground of threats against his own life, he may be permitted to introduce evidence of the threats, but the same shall not be regarded as affording a justification for the offence, unless it be shown that, at the time of the homicide, the person killed, by some act then done, manifested an intention to execute the threat as made.'' [See the article of the Code above referred to, which is followed by the extract first above set out.]

Whilst it is evident this article of the Code has direct reference to cases of murder, or, as expressed in the Code, "when a defendant, accused of murder, seeks to justify himself on the ground of threats," etc., still no reason is seen why the principle enunciated would not apply with equal force, in a proper case, when one is on trial for an assault with intent to murder.

The witness Cummins, it appears from the statement of facts, was permitted to testify, without objection, that he "had known Hunter for fifteen years ; knew his reputation ; in rows he is a very dangerous man, and has the reputation of generally going armed." There was no such error in not permitting the witness to answer the question set out in the bill of exceptions as would have called for the setting aside of a verdict. There was no evidence that the party assaulted had, previous to the *rencontre*, made any threat to take the life of the person assaulted.

It is not questioned that, when great personal violence against the person or the life of an individual has been threatened, and where the person who made the threat manifested, at the time the person against whom the threat has been uttered acts, an intention to execute the threat so made, and it be further shown that the person making the threat is a man of violent or dangerous character, and might reasonably be expected to execute a threat made, the person threatened may stand on his defence. But this is not such a case. Here the defence seems to be, that after the parties had met, and had exchanged blows with their fists, the assaulted party, it is contended, made some motion or gesture from which, it is claimed, the defendant inferred that Hunter was about to draw a pistol, and that those appearances were reasonably calculated to create the impression on the mind of the defendant that he, at the time those alleged demonstrations were made, was in imminent peril of losing his life, or sustaining serious personal injury at the hands of Hunter.

To our minds, this question, whether this state of facts really existed or not, was purely one of fact, addressed to the consideration of the jury, under proper instructions from the court. If it was a case of mutual combat, then, by the law, in order to reduce the offence from murder to man slaughter, it must appear that the contest was waged upon equal terms, and that no undue advantage was sought or taken by either side; for, if such is the case, malice may be inferred, and the killing amount to murder. *King v. The State*, 4 Texas Ct. App. 54, citing 24 Cal. 27. And so, in the present case, if death had ensued, under the facts detailed by the witnesses the killing would have been murder and not manslaughter; and hence the testimony would support a verdict of guilty of even an assault with intent to commit murder. See, also, on this subject, *Wilson v. The State*, 4 Texas Ct. App. 637, and authorities there cited.

The judge who presided at the trial properly comprehended the law of the case, as made by the proofs, and in the charge properly instructed the jury. As to whether there was sufficient evidence to support the charge, or not, was a question properly submitted; and, the jury having passed upon the evidence, we are of opinion that the court did not err in refusing a new trial. Nor do we believe that there are any just grounds of complaint against the charge of the court, or any error in refusing the special charge asked by the defendant. The general charge was an able and eminently fair and accurate enunciation of the law of the case, and covered every legitimate view of the evidence, and all the reasonable deductions to be drawn from the testimony of the witnesses. If there was error at all in the charge, it was in being more favorable to the accused than he was entitled to.

On the vital points discussed by counsel, the most that can be said for the appellant is, that there was some conflict in the testimony. In such a case we would not be warranted in invading the peculiar province of the jury by

setting aside the verdict, it having been found upon sufficient testimony.

It is claimed, both in the motion for a new trial and in the assignment of errors, that counsel for the State, in his closing argument to the jury, made use of improper arguments and language in order to stimulate the jury to return a verdict of guilty.

It does not appear that any effort was made to stay the course of argument, or that the accused asked permission to reply. These matters must largely be left to the discretion of the presiding judge, and are not to be revised on appeal, except in a clear case of abuse of that discretion. It is fair to presume that the jury remembered and acted upon their oaths as jurors, and found their verdict upon the evidence, rather than upon any thing else.

From the whole case as made by the testimony, we fail to discover any material error in the proceedings prejudicial to the rights of the appellant to a fair and impartial trial under the law.

The amount of the fine being clearly within the limits prescribed by law, the verdict ought not to be disturbed because of the amount of the fine imposed. The judgment of the District Court is affirmed.

*Affirmed.*