[Crim. No. 107.    Third Appellate District.—February 16, 1910.]

THE PEOPLE, Respondent, v. S. SHEHADEY, Appellant.

CRIMINAL LAW—MURDER—EXTENSION OF TIME FOR SENTENCE—AMENDMENT OF 1909.—*Held,* that an extension of time for passing sentence upon a conviction of murder in the first degree, made prior to the taking effect of the code amendment of 1909 to section 1191 of the Penal Code, was not limited as to the extent of time which could be allowed, and that it could properly be fixed for two weeks after the verdict, and that, after the taking effect of that amendment, the court could extend the time for ten days further for the purpose of hearing or determining any motion for a new trial.

ID.—INCOMPLETE RECORD OF EXTENSION—PROPER CERTIFICATE OF FULL ORDER.—Where the transcript contained only part of the second order extending time for sentence on motion of the defendant for a further period of six days, without referring to any motion for new trial, the court properly allowed the attorney general to procure a full transcript of the record, so as to show that the extension was granted "so as to enable him to prepare affidavits of newly discovered evidence on motion for new trial," thus showing

that the court acted within the scope of its powers under section 1191 as amended in 1909.

ID.—EVIDENCE—DYING DECLARATIONS—SENSE OF IMPENDING DEATH—INDICATION BY CIRCUMSTANCES.—Dying declarations made under a sense of impending death are admissible. All of the attendant circumstances, including the seriousness of the wound, may be considered in determining whether the deceased made the dying declarations under a sense of impending death. *Held,* that the trial judge was justified in accepting the declarations of deceased as coming within the rule, and in letting them go to the jury.

ID.—CORROBORATION OF DYING DECLARATIONS.—*Held,* that the dying declarations of the deceased find further support and corroboration in other evidence reviewed by the appellate court.

ID.—ALIBI—PROVINCE OF JURY.—The jury were authorized to discredit testimony for the defendant tending to prove an alibi on the night of the crime.

ID.—MOTIVE OF CRIME.—*Held,* that defendant was the only person who appeared to have had any feelings of enmity against the deceased, that defendant had made threats against deceased and that there was no evidence casting the slightest suspicion of the crime on anyone other than the defendant.

APPEAL from a judgment of the Superior Court of Mariposa County, and from an order denying a new trial. J. J. Trabucco, Judge.

The facts are stated in the opinion of the court.

R. B. Stolder, and Charles H. Fairall, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

CHIPMAN, P. J.—Defendant was convicted of murder in the first degree and was sentenced to imprisonment for life. He appeals from the judgment of conviction and from the order denying his motion for a new trial.

The points urged in the brief for reversal of the judgment and order are: 1. That there was no sufficient foundation for the admission of the dying statement of deceased; 2. That if the dying statement of deceased can be considered, it is not supported by evidence sufficient to sustain a verdict of conviction; 3. That there was nothing in the conduct of the de-

fendant, subsequent to the homicide, indicating guilt on his part; 4. That defendant established an alibi.

1. At the argument the point was made for the first time that the time appointed for pronouncing judgment was extended to a date unauthorized by section 1191 of the Penal Code, as amended in 1909, and hence, upon the authority of *Rankin* v. *Superior Court*, 157 Cal. ——, [106 Pac. 718], the order denying defendant's motion for a new trial must be reversed and a new trial ordered, as provided by section 1202, Penal Code, as amended in 1909. The verdict was rendered June 9, 1909, and the court thereupon fixed Saturday, June 26, 1909, at 9 o'clock A. M., "as the time for passing sentence." Section 1191, Penal Code, was amended April 14, 1909, and took effect June 13, 1909, so that when the order was made, June 9th, the court was acting under the old law, by which the court was not limited in its power to defer sentence, and the time for sentence was properly fixed for June 26th. The transcript, as filed, showed, on the day, to wit, June 26th, the following: "On motion of the defendant, it is ordered that the time for passing sentence herein, be and the same is continued to July 2, 1909, at 10 o'clock A. M.," and the transcript shows that on that day defendant came into court with his attorney and asked for a new trial. The order as appearing in the transcript does not on its face show that the time to pass sentence was extended "for the purpose of hearing or determining any motion for a new trial," in which case the court, under section 1191, could have extended the time ten days. Since the transcript was filed, however, the attorney general has filed a certified copy of the "Minute Entry of June 26, 1909, Vol. 3, page 220, Minutes of the Superior Court, Mariposa County," reading as follows:

"June 26, 1909.

"People ⎱ Present J. J. Trabucco, Judge,
"S. Shehadey ⎰ Officers of the Court, the District Attorney, the defendant and his attorney, G. G. Goucher. On motion of the defendant, it is ordered that the time for passing sentence herein, be and the same is hereby continued to July 2, 1909, at 10 o'clock A. M., so as to enable defendant to prepare affidavits of newly discovered evidence on motion for new trial."

The continuance thus given, counting from June 26th, as we may, was within the ten days allowed by section 1191.

Defendant replies: "We admit the power of the court to change its records to conform to the truth, but there is nothing in the record before the court at this time to show that such change has been made upon the order of the court." The answer is that the latest certificate, showing what the minute entry in fact is, comes to us importing verity and not that any change in the minute entry has been made. The implication is that the transcript failed to give the minute entry as it in fact existed, and the certificate was authorized under rule XIV, [144 Cal. xlvi, 78 Pac. x], by which either party may "for the purpose of correcting any error or defect in the transcript suggest the same in writing, . . . or may produce the same duly certified without such order."

It is not claimed by defendant that the minute entry as last certified is not correct. It appears by the foregoing that the court was acting within its powers, and not in violation of section 1191, and it is therefore unnecessary to consider further the scope and meaning of that section.

2. The defendant kept a small store at the town of Varian, Mariposa county, a station on the Yosemite Valley railroad, on the Merced river, and lived with his family in the rear part of the store building. Near by he also kept a saloon. T. F. Halloran, whom he was charged with killing, was a section hand of the railroad company at that point, and up to about two weeks before his death, had boarded and lodged with defendant's family, but had moved into a small cabin sixty-seven feet distant from the Shehadey saloon, or Tent saloon, as sometimes so called, which latter is sixty-seven feet from the Shehadey store or residence. From Halloran's cabin to the railroad section-house is two hundred and sixty-six feet. From the window in the section-house, as testified to by civil engineer N. C. Ray, he could see the door of Halloran's cabin and could also see a man when walking all the way to the Shehadey saloon. Deceased died from a gunshot wound inflicted by a No. 12 shotgun loaded with No. 7 shot and fired at very close range. The witnesses differed as to the time the shot was heard, varying from 8 P. M. to about 9 P. M. of April 5th. The moon was full and shining brightly. It was testified that the deceased appeared at the section-house a

few minutes after the noise of the shot was heard. He "was in his shirt sleeves and drawers" and "in his stockings feet." The section-house was occupied by one Hernandez and his wife and they kept boarders; there were three or four men in the house at this time. Two of them went for John Varian, the postmaster at Varian, who lived about a half a mile distant. He went at once to the section-house and found Halloran lying on a quilt suffering from "a large wound, a little to the right of the navel side, right under the short rib. One of his hands had the middle finger gone from the first joint and the other two fingers, the points were injured."

The evidence, aside from the alleged dying statements of deceased, was circumstantial and not in itself conclusive, or very strongly incriminatory. It is not probable that defendant would have been convicted but for the statements in question, and it is, therefore, important first to inquire as to their admissibility.

Witness John Varian testified: "Halloran said that he was going to die, and that he would like to tell me something about his estate, how he wanted it divided, which he stated. He said that defendant shot him, that he came to the door, and tried to force the door, and he was in bed at the time and finally defendant went off from the door and came up to the door and hollered to him and told him that Si wanted to see him. He went to the door, and as he opened the door he said defendant shot him. I told Halloran that I did not think that he was going to die. I said to him as soon as the doctor would get there he would fix him in shape, and he said, 'I will never live long enough to see a doctor.' Before Halloran died I went to Halloran's cabin at his request to get $20 in coin in his pants and some blankets, as he was getting cold, and he requested me to take charge of his cabin, which I did. Halloran died about 11:40 A. M., April 5th." ("A. M." should read "P. M.," as clearly appears.) On cross-examination the witness testified: "Halloran said he knew defendant because he knew him by his voice and clothes. . . . It was near 9 P. M. when they came after me. It took me about 12 minutes to go up to the section-house. . . . When Halloran died there were present Mr. Plyler, myself, some of the section men and two wood-choppers."

Witness Plyler testified: "I am a merchant. . . . My store is about one-quarter mile from defendant's store and Varian

station. . . . Two Mexicans came after me on the night of
April 5th, and I arrived at Halloran's bedside before he died.
He was lying on the floor in the section-house. He had a big
hole on the right side of his body, the inside part of it came
away out, nearly three inches protruded. Halloran said 'that
Shehadey came to my door and told me Si wanted to talk to
me, and shot me all to pieces.' He said good-bye to all of
us and died. He died within five minutes after he made the
last statement. He made the statement more than once that
he was going to die." The witness arrived at the section-
house about 10:15 P. M. of the 5th of April. The testimony
of the coroner was that there "was an oblong wound measur-
ing two and three-fourths inches in length and one and three-
fourths inches in width on the right side of the abdomen of
deceased. An eighth of an inch of the first finger of the
right hand was shot off. About one-fourth of an inch of the
second finger of the right hand was off the same as the others.
There were no other wounds of consequence. I found shots
in the entrails and in the flesh near the wound in the abdomen.
I picked these shots out of the intestines and some from the
edges of the wound."

We are aware of the strictness of the rule governing the
admissibility of dying declarations, and that the courts should
and do exercise extreme caution in their admission. The sense
of impending death is deemed a sufficient substitute for an
oath, but the test of cross-examination—a most valuable
medium of ascertaining the truth—is wanting. In *People
v. Sanchez*, 24 Cal. 17, 24, Mr. Justice Sanderson stated the
rule in these words: "An undoubting belief existing in the
mind of the declarant, at the time the declarations are made,
is indispensable to that sanction which the law exacts." In
*People* v. *Bemmerly*, 87 Cal. 117, [25 Pac. 266], the court
said: "It is enough, if it satisfactorily appears, in any mode,
that they were made under that sanction, whether it be di-
rectly proved by the express language of the declarant, or be
inferred from his evident danger, or the opinion of medical
or other attendants, stated to him, or from his conduct, or
other circumstances of the case, all of which are resorted to
in order to ascertain the state of the declarant's mind." (1
Greenleaf on Evidence, sec. 158.) The cases hold that all the
attending circumstances may be considered in determining

whether the deceased made the dying declaration under a sense of impending death. (*People* v. *Yokum,* 118 Cal. 437, [50 Pac. 686] ; *People* v. *Lem Deo,* 132 Cal. 119, 203, [64 Pac. 265].) Among the circumstances that may be considered as influencing the mind of the declarant is the seriousness of the wound inflicted upon him. It seems to us that the learned trial judge was justified in accepting the statements as coming within the rule and in letting them go to the jury.

3. It appeared that defendant and deceased, while the latter was living with the family of the former, had some angry words growing out of a small account for goods purchased by deceased from defendant; also that defendant had shown some bitterness toward deceased because of his undue attentions to the wife of defendant. In this connection defendant had made some threats of bodily injury to deceased. Whether it was because of this disagreement, or because defendant's wife on account of her sickness could no longer cook for deceased, that he left and went to his cabin does not very clearly appear. Judging from defendant's feeling toward deceased at that time, it is altogether likely that he quit defendant's house because of the unfriendly attitude of defendant toward him. Witness Nickerson, chief engineer of the Yosemite Valley Railroad, received a letter from defendant, dated March 13, 1909. Defendant is a Syrian by birth and could neither read nor write the English language. This letter was written by his stepdaughter at his dictation, and he admitted having dictated it. The letter is principally a complaint against deceased, and in it defendant alludes to his demand upon deceased to pay his bill, and also refers to his interference with his family. Aaron Varian testified that he was employed hauling freight for defendant; that he arrived at his store with a load on the evening of April 5th. He testified: "While defendant and I were returning to the store from the barn we could see a light in Halloran's cabin and defendant said, 'There is that damned son of a bitch that has got a light in his house.' He was somewhat angry." John Varian, Jr., testified: "I had a conversation with defendant on or about March 17, 1909, relative to Halloran, wherein I asked him how Halloran was getting along. Shehadey said, 'Oh, that son of a bitch; some day when I am feeling right I will fix that Irish son of a bitch. At that time Halloran was not boarding

at Shehadey's; he was boarding over at his cabin where he built his house. When defendant spoke of Halloran he said it kind of laughing.'' Richard Carter testified that at the time Halloran left defendant's house and moved to his cabin, he had a conversation with defendant. "I told defendant that Halloran was eating his breakfast, and defendant said he was going to make out Halloran's bill right away and if he did not pay it that day he would kick his head off. Defendant also said that Halloran wanted to play with his wife and he did not want any man to play with his wife, that he could make his own babies and make them quick if he wanted to.'' Witness Wiley was present and testified to this conversation. This testimony was put forward as tending to show motive. Obviously, as the provocation to a murderous assault, the facts present no very persuasive proof, and yet we cannot say but that in defendant's mind they might have been a contributing cause leading to a strong feeling for revenge.

Mrs. Louisa Hernandez, wife of Benino, who kept the section-house, testified: "Before the wounded man came to the house, I looked out of the window in the dining-room and saw a man dressed in white leave the house where the wounded man lived and walk rapidly toward the saloon—I don't know if he went into the house or the saloon. It was three or four minutes after I saw this man before the wounded man came to my house. I heard a shot just a little while before I looked out the window.'' On cross-examination she testified: "When I heard the shot my husband and friend were at my bed and I was in the kitchen. I naturally looked out of the window immediately I heard the shot. It was moonlight and I could see everything, but did not look very long. When I saw the white figure it was right at the door of the wounded man's cabin. The white figure went toward the house or the saloon, and I think it was a man. When I last saw him he was up on the hill, the bank, the grade, I saw a gun in his hand. . . . I did not have much time. I was only there a few moments. The figure I saw while looking out the window wore white pants or white drawers; don't know which. I only had a glimpse of the figure. It was 8 o'clock P. M. when the wounded man came to the house by my watch in the kitchen.'' It was in evidence that defendant had a shotgun

of No. 12 bore, and that he kept ammunition for such a gun in his store. There was evidence that the defendant was dressed that evening in light colored clothes. Hernandez had a gun of this bore but he testified that it had not been used for some time before. Deputy Sheriff Walter Davis testified that he reached Varian about midnight and Halloran was dead. "The Shehadey store is a wooden structure and his residence is in the rear part of the store. I went around the building several times, but heard no noise of any kind in it. I went to the front door of Shehadey's store and residence a little after midnight and called in a loud voice as follows: 'Solomon, Shehadey, Shehadey.' I received no reply. I arrested defendant about daylight on the morning of the sixth day of April, as he came out. I told him that this piece of business last night was pretty bad; he said he did not know anything about it. I said, 'There is a man shot,' and he said, 'I don't know nothing about it,' and I said the section boss was shot. I asked him if he had a gun and he said he had; he went into the room and pointed to the gun. I told him to walk past and I came and took the gun. The gun was standing at the head of the bed. The bed had the appearance of having been occupied. . . . Both barrels of the gun were empty." The testimony of defendant, his wife and stepdaughter was that defendant went to bed with sick headache about 6 P. M.; was called up to wait upon certain customers who bought some articles and went to the saloon and had a drink with defendant, and that he returned from the saloon to the house and went to bed again and remained there until morning; that they, none of them, knew of the shooting nor heard of it until the next morning, although the whole neighborhood seems to have been aroused and aware of the tragedy. Under-Sheriff Paine took charge of defendant on the 6th and took the gun from Deputy Sheriff Davis. "Defendant said it was his gun. I observed both barrels, they had been cleaned since they were fired. The left barrel was very much cleaner than the right. . . . I had a conversation with defendant; he said that he did not hear any shot and heard no noise during the night as he was asleep. He said he went to bed at 7 and was asleep by 7:30. . . . In a conversation with defendant, I asked him if he and deceased ever had any trouble, and he said they had a little difference about a bill. Defendant

also stated that deceased had bothered his wife by going into her room and kind of making free with her. J. H. Ellis asked him in my presence if it didn't make him mad for Halloran to bother your wife, and he said, 'I think my wife is all right; that is her business.' " The three persons who called at the store on the night of the 5th testified that defendant drank with them and was slightly intoxicated, and that they parted with defendant at 8:45 P. M. The homicide was committed after these persons left defendant, and it must have been very soon thereafter. Defendant's wife and step-daughter did not retire, according to their testimony, until about 11 o'clock, but they testified that they heard no shot and knew nothing of the homicide that night. The section-house where the deceased lay was but one hundred and fourteen feet distant from the Shehadey store and Halloran's cabin was about one hundred and thirty-five feet distant. It would seem hard to believe that with all the coming and going of that night to this section-house no one at Shehadey's heard what it was about. Without further comments, our conclusion is that the dying declarations of the deceased find support in the evidence.

4. The proof of alibi rests largely upon the testimony of defendant, his wife and stepdaughter and upon the variance in the testimony as to the time when the shot was fired. Mrs. Hernandez testified that the wounded man came to her home at 8 o'clock as shown by her watch in the kitchen. Other testimony of the people's witnesses shows that it must have been after half-past 8 o'clock and near to 9. There was time for defendant to have gone to the cabin from his saloon, after parting with his customers, and committed the crime and returned to his house before 9 P. M., as the distance was but sixty-seven feet. The jury evidently did not accept the testimony of defendant and his family as to his whereabouts the night of the 5th of April. We have set out most of the facts and circumstances on which the verdict rested. But in this as in all similar cases there was, no doubt, an atmosphere surrounding the trial which, while indefinable, had its influence upon the jury but could not be incorporated in the record. This atmosphere is sometimes charged with local prejudice and passion and improperly influences the jury. But a careful reading of the record here fails to disclose any evidence

12 Cal. App.—42

that witnesses were testifying under outside pressure in any degree. There was no evidence that any person, other than defendant, had any feelings of enmity against the deceased, nor was there any evidence casting the slightest suspicion on anyone other than defendant.

There are no assignments of error committed in the course of the trial. Defendant seems to have been ably defended, and his cause is well presented here.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 15, 1910.