# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

HEATHER ROSE BROWN,
Defendant and Appellant.

S257631

Third Appellate District
C085998

Shasta County Superior Court
15F2440

March 2, 2023

Justice Groban authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Jenkins, and Cantil-Sakauye[*] concurred.

---

[*] Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. BROWN

S257631


Opinion of the Court by Groban, J.


Defendant Heather Rose Brown gave birth to a baby girl in a hotel room. In the fifth day of her life, while lying face down between her sleeping parents who were both under the influence of heroin, Brown's newborn daughter stopped breathing. When Brown woke and noticed, she directed her daughter's father to call 911. Brown administered CPR, following the dispatcher's instructions, until the ambulance arrived. Further efforts to resuscitate Brown's daughter were unsuccessful. An autopsy revealed traces of heroin-derived morphine and methamphetamine in the baby's body fluids and the contents of her stomach.

The District Attorney charged Brown with first degree murder and prosecuted the charge on the theory that Brown had poisoned her newborn daughter by feeding her breast milk after smoking heroin and methamphetamine. The trial court instructed the jurors that to convict Brown of first degree murder they had to find she committed "an act" with the mental state of malice aforethought that was a substantial factor in causing her baby's death and that she "murdered by using poison." The instructions did not require the jury to find that Brown acted with any particular, heightened mental state when she fed her baby her breast milk. They thus allowed the jury to convict Brown of first degree murder if it found that she acted with malice — a mental state that normally would only support a conviction of second degree murder — and that poison was a substantial factor in causing her baby's death. Based on these instructions, the jury

1

convicted Brown of the first degree murder of her newborn daughter, for which the court imposed a sentence of 25 years to life in prison.

Brown argues that the jury instructions were incomplete because they did not require the jury to find she fed her daughter her breast milk with a mental state equivalent in turpitude to the willfulness, deliberation, and premeditation that generally distinguishes first degree murder from second degree murder. The Attorney General argues that the instructions were complete, because, in his view, proof that a defendant used poison is sufficient to elevate a murder to the first degree, without any proof of mental state beyond the showing of malice required for all murder convictions. We conclude Brown has the better argument.

When dividing the common law offense of murder into two degrees, the Legislature reserved for the first degree types of murders that are "cruel and aggravated" and thus "deserving of greater punishment" than other malicious or intentional killings, which are punishable only as second degree murder. (*People v. Sanchez* (1864) 24 Cal. 17, 29 (*Sanchez*).) From the beginning, those murders have included all murder "perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing." (1 Hittell's Cal. Gen. Laws from 1850 to 1864, par. 1425, § 21 (1872) (Hittell's); *id.* at par. 1423, § 19.)

We previously have interpreted this language to require proof of a mental state more culpable than the malice required for second degree murder, in keeping with the Legislature's determination that murders perpetrated by these means warrant the greater punishment reserved for first degree murder. For torture murder, the prosecution must show "wilful, deliberate and premeditated

intent to inflict extreme and prolonged pain." (*People v. Steger* (1976) 16 Cal.3d 539, 546 (*Steger*).) For lying in wait murder, the prosecution must show the defendant performed the acts of watching, waiting, and concealment with the intent to take the victim by surprise to facilitate the infliction of injury likely to cause death. (*People v. Webster* (1991) 54 Cal.3d 411, 448 (*Webster*); *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1149, fn. 10 (*Gutierrez*).) However, since in a typical first degree murder by poison case there is no question that the defendant acted with willfulness, deliberation, and premeditation, we have never addressed whether there is a mental state component of first degree poison murder. We now clarify that to prove first degree murder by means of poison, the prosecution must show the defendant deliberately gave the victim poison with the intent to kill the victim or inflict injury likely to cause death.

The trial court's instructions did not include this element of first degree poison murder. This was error. And because a rational jury could have concluded the prosecution did not prove beyond a reasonable doubt that Brown deliberately gave her newborn daughter the poisonous substances in her breast milk with the intent to kill her or inflict injury likely to cause her death, the error was prejudicial. Accordingly, we reverse Brown's first degree murder conviction.

## I. BACKGROUND

### A. Trial Court Proceedings

#### 1. *Evidence of Events Leading to Baby's Death*

In a recorded interview played for the jury, Brown told a police investigator she met her husband, Daylon Reed, when she was twenty years old. Reed dealt and used drugs, including marijuana, methamphetamine, and heroin, and soon after meeting

him, Brown began to use heroin. A few months into their relationship, Brown learned she was pregnant. Brown continued to use heroin during her pregnancy and occasionally also used methamphetamine.

Brown had almost no prenatal care and she and Reed made no arrangements for their baby's birth. When Brown went into labor, the couple got a hotel room and Brown called a friend and asked her to find a midwife. Brown's friend called a friend of hers, a doula who had assisted a midwife with some deliveries, who agreed to attend the birth. Brown smoked heroin while in labor, believing it would help with the pain, hiding that she was doing so from the doula and her mother, who also was present for the birth, by smoking in the bathroom.

At trial, several witnesses testified that Brown said she did not want to give birth in a hospital because she was afraid that if she tested positive for drugs the baby would be taken away. Reed's sister Michelle testified that she had given birth to a baby boy at a local hospital not long after meeting Brown. The baby experienced withdrawal, Child and Family Services became involved, and Michelle voluntarily relinquished custody.

Brown's daughter, Dae-Lynn Rose, appeared healthy at birth, but a couple days later began to appear ill. The doula, Brown's mother, and Brown's father and stepmother all advised Brown and Reed to take the baby to a doctor, but they did not do so. Brown admitted to the police investigator that she believed that if she gave birth at the hospital or took her baby to a doctor, her baby would be taken from her. Nevertheless, Brown said she had been planning to take Dae-Lynn to a doctor on the day she died.

Brown also admitted that after Dae-Lynn's birth, she and Reed smoked heroin almost every day. She said they smoked in

the bathroom so the baby would not inhale it. When confronted, she admitted that she also smoked methamphetamine once during her daughter's life.

Brown fed Dae-Lynn both breast milk and infant formula. When Dae-Lynn was two days old, Brown searched for information on the internet about how to help newborns suffering from withdrawal. She told the police investigator she continued to feed Dae-Lynn breast milk because she had read on the internet that when "babies were withdrawing" breast milk is "supposed to help ease 'em." When the investigator asked Brown whether she supplemented her breast milk with formula because she was afraid that the heroin she was using would pass into her breast milk, Brown responded, "Yes, and it wasn't just that. It was also the lack of milk that I was producing." When the investigator suggested to Brown that perhaps she had intentionally passed drugs to Dae-Lynn in her breast milk to try to alleviate her withdrawal symptoms, Brown responded, "I never had that thought even come across my mind."

### 2. *Evidence Related to Baby's Death*

Dae-Lynn died in the fifth day of her life. In the early morning hours, Brown and Reed smoked heroin. Later, Brown fed Dae-Lynn a couple of times, giving her breast milk and infant formula. Mid-morning, Brown fell asleep, putting the baby face down between her and Reed on the hotel room bed. Dae-Lynn woke up again once, crying, and Brown repositioned her so she was lying next to Brown, under Brown's arm. Around noon, a housekeeper woke Brown and Reed and told them they needed to go to the office and pay if they were planning to stay another night, but they fell

back asleep without paying.  Before falling asleep, Brown looked at Dae-Lynn, who was breathing normally.

Around 1:00 p.m., hotel management woke Brown and Reed, telling them they had to leave unless they paid for another night. Brown went to the door to pay, then checked on Dae-Lynn.  Though the baby's body was warm, she was not breathing.  Brown told Reed to call 911.  The dispatcher sent an ambulance and instructed Brown over the phone on how to administer CPR, which she did until paramedics arrived.  Shortly after arriving at the hospital, Dae-Lynn was pronounced dead.

When the police investigator asked Brown later that day what she thought caused Dae-Lynn's death, she said she thought maybe she had accidentally suffocated her daughter in her sleep. When he asked her whether she suffocated Dae-Lynn on purpose, she denied any intent to harm her daughter and expressed her love for Dae-Lynn and excitement about being a mom.  When the police investigator told Brown six months later, at the time of her arrest, that the autopsy report said her baby had died from exposure to methamphetamine and heroin, Brown responded: "[T]hat . . . kills me because I was only trying to help her.  I didn't wanna try to harm my daughter at all.  I never would intentionally."[1]

### 3. *Jury Instructions*

The trial court instructed the jury that to find Brown guilty of murder, it must find she intentionally committed a prohibited act or intentionally failed to perform a required act "with a specific

---

[1]     The prosecutor put on several witnesses to testify about potential causes of Dae-Lynn's death.  Brown raised a challenge to the sufficiency of the evidence that Dae-Lynn's death was caused by poison, which the Court of Appeal rejected.  This issue is not before us, and we express no view on it.

intent and/or mental state" that would be explained in the murder instruction. In the murder instruction, the court explained that to convict Brown of murder in the first or second degree, the jury had to find that she committed "an act" that was a substantial factor in causing the victim's death with the mental state of malice aforethought. As to the act requirement, the court further instructed that a parent's "failure to act" in accordance with the duty to "provide care, obtain medical attention and protect a child . . . is the same as doing any . . . injurious act." As to the mental state requirement, the court explained that malice can be either express, meaning the defendant "unlawfully intended to kill," or implied, meaning that: (1) "she intentionally committed an act," (2) "the natural and probable consequences of the act were dangerous to human life," (3) "[a]t the time she acted, she knew her act was dangerous to human life," and (4) "she deliberately acted with conscious disregard for human life." The court elaborated: "[M]alice aforethought does not require hatred or ill will toward the victim. . . . It does not require deliberation or the passage of any period of time."

On the degree of murder, the trial court explained: "If you decide the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree . . . ." The trial court then instructed the jury on the additional finding it would have to make to convict Brown of first degree murder: "The defendant is guilty of first degree murder if the People have proved that the defendant murdered by using poison. Poison is a substance applied externally to the body or introduced into the body that can kill by its own inherent qualities." The court did not instruct the jury that it needed to find that Brown had any particular, heightened mental

state in giving the poison to the victim to find her guilty of murder in the first degree rather than in the second degree.

### 4. *Verdict and Sentencing*

The jury convicted Brown of the first degree murder by poison of Dae-Lynn, among other offenses not at issue. The trial court imposed a sentence of 25 years to life for that count.

### B. **Court of Appeal Proceedings**

On appeal, Brown contended that the jury instruction on first degree poison murder was incomplete because it did not inform the jury that the defendant must administer the poison willfully, deliberately, and with premeditation. In an unpublished opinion, the Court of Appeal rejected this argument, concluding: "[I]t appears the People need only prove that the killing was *caused* by administration of poison, and that the killing was done with malice. Such a killing is first degree murder as a matter of law." [2]

## II. **DISCUSSION**

We granted review to determine whether, to prove first degree murder by poison, it is enough for the prosecution to show the defendant's use of poison was a substantial factor in causing the victim's death, or whether instead the prosecution must show the defendant acted with a particular mental state when using the poison, separate from the showing of malice that would support a conviction of second degree murder. We also agreed to decide

---

[2] We are not aware of any other case, and the Attorney General has cited none, in which an appellate court in this country has upheld a first degree murder conviction of a drug-addicted mother whose baby died after drinking breast milk containing controlled substances the mother had consumed.

whether reversal of Brown's first degree murder conviction would be required if we concluded the trial court erred in failing to instruct on the mental state required for first degree poison murder. For the reasons discussed below, we hold that to elevate a murder to the first degree, it is not enough for the prosecution to prove the use of poison was a substantial cause of the victim's death; instead, the prosecution must prove the defendant deliberately gave the victim poison with the intent to kill the victim or inflict injury likely to cause the victim's death. Because we cannot conclude beyond a reasonable doubt that the jury would have found Brown guilty of first degree murder had it been so instructed, we reverse the judgment of the Court of Appeal.

## A. Instructional Error

A trial court must instruct on each element of a charged offense, even when the defendant does not propose a complete instruction or object to the court's failure to provide one. (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) In this case, the trial court did not instruct the jurors that they were required to find Brown had used the poison with any particular, heightened mental state to convict her of murder in the first degree. Rather, its instruction on the degree of murder permitted the jurors to find Brown guilty of first degree murder if they found that she committed murder and the use of poison was a substantial factor in causing her daughter's death. Under these instructions, second degree implied malice murder became first degree murder based on the act of using poison alone; the jury was not required to find that Brown acted with a more culpable mental state when feeding her daughter her breast milk.

To determine whether the trial court erred in failing to instruct on the mental state element of first degree murder by poison, we

must first determine whether there is such an element. Brown argues a poison murder is only in the first degree if the killer poisoned the victim on purpose, with the calculated deliberation and cold-blooded intent that renders first degree murder more deplorable than second degree murder, and that the trial court's failure to instruct on this mental state was error. The Attorney General disagrees, arguing that no instruction on the mental state specific to the act of poisoning was required because all murders by means of poison are categorically murders in the first degree. In the Attorney General's view, the act of using poison suffices to elevate an implied malice murder to the first degree.

### 1. *Language, Context, and History of Penal Code Section 189*

To resolve this dispute, we begin with an examination of the statutory language in its historical context. Penal Code section 187 defines "murder" as "the unlawful killing of a human being . . . with malice aforethought." (*Id.*, subd. (a).)[3] Section 189 describes the two degrees of murder, defining first degree murder to include, in relevant part, "[a]ll murder that is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing . . . ." (§ 189, subd. (a).) Second degree murder is defined by exclusion: All murder that is not first degree murder is "of the second degree." (*Id.* subd. (b).)

---

[3] All further undesignated statutory references are to the Penal Code.

This division of murder into two degrees — and the designation of murders by means of poison, lying in wait, and torture as kinds of first degree premeditated murder — has been part of California law since before the adoption of the Penal Code. California's first murder statute, enacted in 1850, defined murder as "the unlawful killing of a human being, with malice aforethought, either express or implied" and provided only one penalty for murder: death. (Garfielde & Snyder Compiled Cal. Laws, § 19 (1853); *id.*, § 21.) In 1856, the Legislature amended the statute to designate two degrees of murder. (Stats. 1856, ch. 139, § 1, p. 219; *People v. Wiley* (1976) 18 Cal.3d 162, 168 (*Wiley*).) Death remained the only punishment for first degree murder; second degree murder was punishable by a term of imprisonment "not less than ten years and which may extend to life." (Hittell's, *supra*, par. 1425, § 21; *Wiley*, at p. 168.) As part of the 1856 amendment, the Legislature designated as first degree murders those "perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing." (Hittell's, *supra*, par. 1425, § 21.) When the Legislature adopted the Penal Code in 1872, it carried over this division between first degree murder and second degree murder into section 189. Although other kinds of "willful, deliberate, and premeditated" killing have been added to section 189 since its enactment, the relevant language — "[a]ll murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree. . . " — remains substantially unchanged to this day. (1872 Pen. Code, § 189.)

Explaining the Legislature's intent in enacting section 189, the California Code Commission[4] noted that the division of murder into two degrees was based on the "manifest injustice" of inflicting the death penalty in cases involving killings that "differed greatly from each other in the degree of atrociousness." (Code commrs., note foll., Ann. Pen. Code, § 189 (1st ed. 1872, Haymond & Burch, commrs.-annotators) p. 82.) The Commission's notes quote with approval our 1864 opinion in *Sanchez*, *supra*, 24 Cal. 17, in which we described the Legislature's basis for distinguishing the two degrees of murder as follows: "In order to constitute murder of the first degree there must be something more than a malicious or intentional killing. . . . [¶] In dividing murder into two degrees, the Legislature intended to assign to the first, as deserving of greater punishment, all murders of a cruel and aggravated character; and to the second all other kinds of murder which are murder at common law; and to establish a test by which the degree of every case of murder may be readily ascertained. That test may be thus stated: Is the killing wilful, (that is to say, intentional,) deliberate, and premeditated? If it is, the case falls within the first, and if not, within the second degree." (*Id.* at pp. 28–29; see code commrs., note foll., Ann. Pen. Code, § 189, *supra*, at pp. 82–83.) As to murders by poison, lying in wait, and torture, we observed that the Legislature considered the means used to "carry with them conclusive evidence of premeditation"[5] because these means of killing, by their nature,

---

[4]  In construing the Penal Code of 1872, the Code Commissioners' notes are entitled to substantial weight because the commissioners drafted the code. (*Keeler v. Superior Court* (1970) 2 Cal.3d 619, 630.)

[5]  In later cases, we moved away from the concept of "conclusive" proof, referring instead to proof of murder by means of

involve "the deliberate and preconceived intent to kill." (*Sanchez*, at pp. 29–30.)

This history shows the Legislature specified that "[a]ll murder that is perpetrated by means of . . . poison, lying in wait, [or] torture . . . is murder of the first degree" because it considered such murders to be kinds of "willful, deliberate, and premeditated killing," and as such deserving of the greater punishment reserved for first degree murders, which at the time of section 189's enactment was death. (§ 189, subd. (a); see *People v. Milton* (1904) 145 Cal. 169, 170 (*Milton*) [the means of poison, lying in wait, and torture "furnish evidence of willfulness, deliberation, and premeditation" because the statute designates these means as kinds of "willful, deliberate, and premeditated killing"].) In designating murders carried out by these means as first degree murder, the Legislature intended to require "something more" than the showing of a malicious or intentional killing required for second degree murder — something equivalent in turpitude to willfulness, deliberation, and premeditation. (*Sanchez*, *supra*, 24 Cal. at p. 28; *id.* at p. 29.)[6]

---

poison, lying in wait, or torture as "the functional equivalent of proof of premeditation, deliberation and intent to kill" (*People v. Ruiz* (1988) 44 Cal.3d 589, 614 (*Ruiz*)), and observing that a showing of murder by one of these means "obviates the necessity of separately proving premeditation and deliberation . . . ." (*People v. Hardy* (1992) 2 Cal.4th 86, 162.)

[6] As noted, murder by means of poison, lying in wait, and torture all appeared in the statute at its inception. (Pt. II.A.1, *ante*, at pp. 11–12.) We express no opinion on other categories of first degree murder that the Legislature subsequently added to section 189.

## 2. *First Degree Murder by Torture, Lying in Wait, and Other Means*

While an examination of the language of section 189 in its historical context reveals the Legislature's intent to require proof of "something more" than malice to elevate a murder by means of torture, lying in wait, or poison to the first degree, it reveals little about what that "something more" might be. (*Sanchez, supra,* 24 Cal. at p. 28.) For that, we turn to our case law. We have never been asked to directly address what mental state in the administration of poison is required to elevate a poison murder to the first degree. We have, however, addressed this question in the contexts of murder by torture and by lying in wait — the two other kinds of "willful, deliberate, and premeditated killing" that section 189 has listed as categorically "murder of the first degree" since its enactment. In both contexts, we have concluded that more than malice is required; the defendant must have committed the designated act with a specific mental state that is equivalent to willfulness, deliberation, and premeditation.

We discussed the mental state component of murder by means of torture in *People v. Heslen* (1945) 163 P.2d 21 (*Heslen*), concluding that "the requirement of an intent to cause pain and suffering" is implicit in the word "torture." (*Id.* at p. 27.) Later, in *People v. Tubby* (1949) 34 Cal.2d 72, we emphasized that "[t]he dictionary definition [of torture] was appropriately enlarged upon by this court" in *Heslen* to include "intent . . . to cause cruel suffering." (*Tubby,* at pp. 76–77.) We further elaborated on this definition in *Steger, supra,* 16 Cal.3d at page 546, explaining that first degree "murder by means of torture" is "murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." We reasoned: "In labeling torture as a 'kind' of premeditated killing, the Legislature requires the same proof of

deliberation and premeditation for first degree torture murder that it does for other types of first degree murder." (*Ibid*.) We went on to explain: "It is not the amount of pain inflicted which distinguishes a torturer from another murderer, as most killings involve significant pain. [Citation.] Rather, it is the state of mind of the torturer — the cold-blooded intent to inflict pain for personal gain or satisfaction — which society condemns. Such a crime is more susceptible to the deterrence of first degree murder sanctions and comparatively more deplorable than lesser categories of murder." (*Ibid*.) Our holding in *Steger* thus rested on the premise that the requirement that the defendant have a mental state of "wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain" was necessary to preserve the distinction between calculated, deliberate murder, which is murder in the first degree, and other types of intentional or malicious killing, which are second degree murder. (*Id*. at p. 546; *id*. at pp. 544–546 & fn. 2; see *Wiley*, *supra*, 18 Cal.3rd at p. 168 [torture designated as first degree murder in part because "the calculated nature of the acts causing death" make torture particularly reprehensible]; *People v. Cole* (2004) 33 Cal.4th 1158, 1227 [same].)

In *People v. Tuthill* (1947) 31 Cal.2d 92, we addressed the mental state question in the context of first degree murder by lying in wait. We began by noting the need for interpretation of the statutory language before declaring that a "literal[]" understanding of the term lying in wait includes "[t]he elements of waiting, watching, and secrecy." (*Id*. at p. 101; *id*. at p. 100.) Elaborating on this understanding, we since have established that "it is not sufficient to merely show the elements of waiting, watching and concealment. It must also be shown that the defendant did those physical acts with the intent to take [the] victim unawares and for the purpose of facilitating [the] attack." (*People v. Mattison* (1971)

15

4 Cal.3d 177, 183 (*Mattison*); see *Webster*, *supra*, 54 Cal.3d at p. 448 ["The concealment required for lying in wait 'is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise' "]; *People v. Laws* (1993) 12 Cal.App.4th 786, 795 (*Laws*) [lying in wait involves the "intent to watch and wait for the purpose of gaining advantage and taking the victim unawares in order to facilitate the act which constitutes murder"].) We have also established that the defendant must act with a " 'wanton and reckless intent to inflict injury likely to cause death,' " (*Gutierrez*, *supra*, 28 Cal.4th at p. 1148), and the period of lying in wait must be sufficient to show that the defendant had " ' "a state of mind equivalent to premeditation or deliberation" ' " (*People v. Stevens* (2007) 41 Cal.4th 182, 202). Only upon these specific showings of the defendant's mental state in lying in wait do we consider the defendant to have acted with "the functional equivalent of" a premeditated, deliberate intent to kill (*People v. Stanley* (1995) 10 Cal. 4th 764, 794 (*Stanley*)), such that "no further evidence of premeditation and deliberation is required in order to convict the defendant of first degree murder" (*People v. Sandoval* (2015) 62 Cal.4th 394, 416).

Thus, in both the torture-murder context and the lying-in-wait context, we have given content to the bare statutory requirement that a first degree murder be "perpetrated by means of . . . poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing." (§ 189, subd. (a).) At the same time, we have emphasized that separate proof of premeditated intent to kill is not required in either context. (See *Gutierrez, supra*, 28 Cal.4th at p. 1149 [lying in wait special circumstance requires " 'an intentional murder,' " whereas first degree murder requires " 'only a wanton and reckless intent to inflict injury likely to cause

death' "]; *People v. Davenport* (1985) 41 Cal.3d 247, 271 (*Davenport*) [special circumstance can be "distinguished from murder by torture under section 189" because for the torture-murder special circumstance "the defendant must have acted with the intent to kill"].) Our narrow constructions of "torture" and "lying in wait" effectuate the Legislature's understanding that a murder by these means involves, by its nature, a mental state more "cruel and aggravated" than malice — a mental state equivalent in turpitude to willfulness, deliberation, and premeditation — but that it need not involve the premeditated intent to kill. (*Sanchez*, *supra*, 24 Cal. at p. 29; *Steger*, *supra*, 16 Cal.3d at p. 546, fn. 2; *Laws*, *supra*, 12 Cal.App.4th at p. 795.)

### 3. First Degree Murder by Means of Poison

This case brings to light the need for us to elaborate on the meaning of the phrase "murder . . . perpetrated by means of . . . poison," just as prior cases have required us to elaborate on the meanings of "torture" and "lying in wait." (§ 189, subd. (a).) Since first degree murder by poison shares a legislative history and purpose with first degree murder by lying in wait and by torture, it would be incongruous not to read a similar state of mind requirement — one equivalent in turpitude to willful, deliberate, premeditated intent to kill — into first degree poison murder. Latent ambiguity in the term "poison," as in the terms "torture" and "lying in wait," further suggests the need to clarify the mental state requirement. The standard instruction the trial court gave in this case defines poison as "a substance, applied externally to the body or introduced into the body, that can kill by its own inherent qualities." (CALCRIM No. 521.) But the use of a substance that is inherently capable of killing does not in and of itself render a murder particularly reprehensible. (Cf. *People v. Watson* (1981) 30 Cal.3d 290, 296–297 [vehicular homicide with

implied malice is second degree murder].) And many poisonous substances can be used to help people in the correct quantities, circumstances, and applications. (See, e.g., *People v. Archerd* (1970) 3 Cal.3d 615 (*Archerd*) [insulin]; *People v. Jennings* (2010) 50 Cal.4th 616 (*Jennings*) [sedatives].) Indeed, as one court has observed, "[a] fundamental tenet of toxicology is that the 'dose makes the poison' and that all chemical agents, including water, are harmful if consumed in large quantities, while even the most toxic substances are harmless in minute quantities." (*Mancuso v. Consolidated Edison Co. of New York* (S.D.N.Y. 1999) 56 F.Supp.2d 391, 403.) The knowing administration of a substance capable of causing death — even under conditions demonstrating a conscious disregard of that risk — does not show a state of mind equivalent to "willful, deliberate, and premeditated killing." (§ 189, subd. (a).)

The Attorney General attempts to distinguish poison murder from murder by torture and lying in wait by arguing that poison is more closely analogous to the additional means of murder the Legislature designated as first degree murder after the Penal Code's enactment: murders by means of "destructive device or explosive, a weapon of mass destruction, [or] knowing use of ammunition designed primarily to penetrate metal or armor." He argues that torture and lying in wait are "methods" of murder, while poison (like a weapon of mass destruction) is a "mechanism" by which a murder may be committed. This argument ignores the plain language of section 189, which does not distinguish between "methods" and "mechanisms," but instead lists torture and lying in wait alongside poison as "means" of first degree murder. It also ignores the legislative history of section 189, which originally listed poison, lying in wait, and torture as the three "means" of murder that are prototypical kinds of "wilful, deliberate, and premeditated" killing. (*Sanchez, supra*, 24 Cal. at p. 28; *id.* at pp. 29–30.)

Regardless of whether proof of the defendant's mental state is required to elevate to the first degree a murder by means of destructive device, explosive, weapon of mass destruction, or armor-piercing ammunition — a question we do not reach in this case — their subsequent addition to section 189 does not provide a basis for distinguishing poison from lying in wait and torture with respect to the required mental state.

That the Legislature would consider poison murder — like murder by lying in wait or torture — to be a kind of "wilful, deliberate, and premeditated" killing (Hittell's, *supra*, par. 1425, § 21) makes sense when we think of the typical poison murder, in which the defendant intentionally and surreptitiously administers a deadly dose of poison to an unsuspecting victim. The poison murder cases we have decided to date generally follow this pattern. In *People v. Albertson* (1944) 23 Cal.2d 550 (*Albertson*), the defendant was accused of putting cyanide in vitamin capsules and mailing them to the victim with a letter advertising them as " ' "vitalizing vitamin vigor." ' " (*Id.* at p. 559; *id.* at p. 563.) In *Archerd*, *supra,* 3 Cal.3d 615, the defendant injected two of his wives and his nephew with massive doses of insulin, causing diabetic shock. (*Id.* at pp. 625–626, 631–635.) In *People v. Diaz* (1992) 3 Cal.4th 495 (*Diaz*), a nurse murdered 12 intensive care unit patients by injecting them with overdoses of lidocaine. (*Id.* at pp. 517–518, 538.) In *People v. Catlin* (2001) 26 Cal.4th 81 (*Catlin*), the defendant murdered his wife and mother by giving them the highly toxic weed-killer paraquat. (*Id.* at pp. 99–103.) And in *People v. Blair* (2005) 36 Cal.4th 686 (*Blair*), the defendant murdered his drinking companion by putting cyanide in a bottle of gin, carefully replacing the cap so the bottle appeared unopened, and having the bottle delivered to the victim by a mutual friend. (*Id.* at pp. 745–746.)

Court of Appeal cases likewise follow this pattern. In *People v. Botkin* (1908) 9 Cal.App. 244, the defendant murdered her lover's wife by sending her a box of candy containing arsenic "with intent that [she] should eat thereof and be killed thereby." (*Id.* at p. 249.) In *People v. Potigian* (1924) 69 Cal.App. 257, the defendant gave arsenic to her stepdaughter "with intent to bring about her death." (*Id.* at p. 264.) And in *People v. Cobler* (1934) 2 Cal.App.2d 375 (*Cobler*), the defendant murdered her husband by slipping strychnine into a glass of milk and giving it to him to drink with his breakfast. (*Id.* at pp. 377–379.)

In each of these cases, the way the defendant carried out the poisoning left no question that the defendant deliberately gave the victim poison, if not with the intent to kill, at least with the intent to inflict injury likely to cause the victim's death. Perhaps for this reason, none of these cases directly addresses whether the prosecution must prove the defendant had a specific, heightened mental state in giving the victim the poison to elevate a poison murder to the first degree, and if so, what mental state the prosecution must prove. Our case law does, however, provide some guidance on these questions.

In *Mattison*, *supra*, 4 Cal.3d at pages 184–186, we addressed the distinction between second degree felony murder based on felony poisoning in violation of section 347[7] and first degree poison murder, of which the jury had acquitted the defendant. The

---

[7]     *Mattison* predated Senate Bill No. 1437 (2017–2018 Reg. Sess.), which amended section 188 to provide that except in the case of first degree felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); Senate Bill No. 1437 (2017–2018 Reg. Sess.) § 2; Stats. 2018, c. 1015.)

defendant argued that second degree poison murder is "legally impossible" because all murders in which poison caused the death are in the first degree. (*Mattison*, at p. 180; *id.* at pp. 181–182.) We rejected this argument, concluding that a jury could have properly found the defendant guilty of second degree felony murder by means of poison. (*Id.* at p. 182.) We reasoned that the difference between first degree murder by poison and second degree felony murder in violation of section 347 — which prohibits poisoning food, drinks, and medicine — is the state of mind with which the defendant gave the victim the poison. (*Mattison*, *supra*, 4 Cal.3d at p. 186.) At the time, section 347 required the prosecution to prove that the defendant " 'willfully mingle[d] any poison with any food, drink or medicine, with intent that the same shall be taken by any human being to his injury . . . .' " (*Mattison*, at p. 184, quoting Pen. Code, former § 347.) We observed that "[b]y making it a felony to administer poison with the intent to cause any injury, the Legislature has evidenced its concern for the dangers involved in such conduct, and the invocation of the second degree felony-murder rule in such cases when unforeseen death results serves further to deter such dangerous conduct." (*Mattison*, at p. 186.) We emphasized, however, that "[t]o go further" and hold the commission of felony poisoning could both substitute for the required element of malice and elevate the murder to first degree "would make the use of poison serve double duty and result in criminal liability out of all proportion to the '*turpitude of the offender.*' " (*Ibid.*; see *Blair*, *supra*, 36 Cal.4th at p. 745 [observing that death resulting from a poisoning carried out with "intent to injure or intoxicate the victim" is second degree felony murder].) Drawing parallels to the lying in wait and torture contexts, we observed that "[w]hen it is contended that a killing was committed by poison it likewise must be established that the killing was

murder. '[I]t is not enough to show that a poison was administered and that a death resulted. If the poison was innocently given under the belief that it was a harmless drug and that no serious results would follow, there would be no malice, express or implied, and any resulting death would not be murder. [Citation.] If, however, the defendant administered poison to his victim for an evil purpose, so that malice aforethought is shown, it is no defense that he did not intend or expect the death of his victim.' " (*Mattison, supra,* 4 Cal.3d at p. 183.)

The parties debate the significance of these observations. The Attorney General cites *Mattison* in support of his argument that a showing of implied malice in giving the victim poison is sufficient to elevate it to the first degree. He would have us read *Mattison* as holding that if the prosecution proves the defendant administered the deadly poison with malice, the murder is categorically first degree murder. Brown contends that *Mattison's* observation that the poisoning must be done with an " 'evil purpose' " supports her construction of the statutory language as requiring something more than malice in the administration of the poison. (*Mattison, supra,* 4 Cal.3d at p. 183.) *Mattison* does not clearly support either position.

In *Mattison,* we were not called upon to decide whether the prosecution must prove a state of mind in the administration of poison that is more culpable than malice for the murder to be in the first degree. Instead, the question before us was whether the defendant had been validly convicted of second degree murder by means of poison. (*Mattison, supra,* 4 Cal.3d at pp. 180–182.) We did not identify the specific mental state necessary to elevate a murder by means of poison to the first degree. However, our holding rested on the premise that to be a first degree murder, the act of using poison must be carried out with a state of mind more

culpable than that associated with second degree murder on a felony murder theory, i.e., more culpable than " 'willfully mingl[ing] any poison with any food, drink or medicine, with intent that the same shall be taken by any human being to his injury . . . .' " (*Id.* at p. 184.)

While *Mattison, supra,* 4 Cal.3d at page 186 made clear that to prove first degree murder by poison, the prosecution must show a mental state more culpable than willful administration of poison with intent to injure, our cases have also made clear it is not necessary to prove the defendant administered the poison with intent to kill.[8] This rule emerged out of automatic appeals in death penalty cases, in which we distinguished first degree poison murder from the poison-murder special circumstance, which requires that "[t]he defendant intentionally killed the victim by the administration of poison." (§ 190.2, subd. (a)(19).) In *Catlin, supra,* 26 Cal.4th at page 158, we relied in part on the special circumstance's intent to kill requirement to reject the defendant's challenge to the special circumstance as inadequately narrowing the class of death-eligible defendants. We observed that first degree poison murder encompasses a broader class of defendants than the poison murder special circumstance because "[t]he special circumstance allegation, unlike the definition of first degree murder by poison, requires proof that the defendant intentionally killed the victim." (*Ibid.*) In *Jennings, supra,* 50 Cal.4th 616, we relied on the special circumstance's intent to kill requirement to reject the defendant's claim that the jury's "not true" finding on the poison murder special circumstance meant that "he could not have

---

[8]     As noted above, we have reached similar conclusions in the torture and lying in wait contexts. (*Gutierrez, supra,* 28 Cal.4th at p. 1148; *Davenport, supra,* 41 Cal.3d at p. 271.)

been convicted of first degree murder by poison." (*Id.* at p. 639.) In *Jennings*, parents intentionally gave three powerful sedatives to their five-year-old son, whom they had been starving and brutally beating. (*Id.* at pp. 630–634, 640–641.) The defendant — the child's father — argued that because the jury had found the poison murder special circumstance "not true," it could not have based its first degree murder verdict on a poison murder theory. (*Id.* at p. 639.) In rejecting this argument, we reasoned that the jury's not true finding did not necessarily mean it had acquitted the defendant of first degree murder because a showing of intent to kill is not necessary to prove first degree murder when a murder is by means of poison. (*Id.* at pp. 639–640.)[9]

---

[9] The Attorney General relies on *Jennings* to argue that all that is required for a first degree poison murder conviction is a showing of malice. He points out that, in distinguishing the special circumstance, we observed "the jury still could have reasonably found defendant guilty of first degree murder by poison" even if it did not find he acted with premeditated intent to kill "if it found that either codefendant acted with implied malice." (*Jennings*, *supra*, 50 Cal.4th at p. 640.) It is true that *Jennings* addressed the sufficiency of the evidence to support a conviction of first degree poison murder. (*Id.* at pp. 639–641.) But we were not presented with the question we now consider: whether a showing of a mental state more culpable than malice in connection with administering the poison is required to elevate a murder by means of poison from the second degree to the first degree. Read in this context, the portion of *Jennings* on which the Attorney General relies simply reiterates that separate proof of premeditated intent to kill is not required to establish that a murder by means of poison is in the first degree. (See also *Diaz*, *supra,* 3 Cal.4th at p. 538 [rejecting defendant's argument for reversal based on insufficient evidence of "premeditation and deliberation" on the ground that the evidence showed the murders "could not have been spontaneous acts" and observing that where "a murder is accomplished by means of

In summary, the act of killing by poison may support a finding of a second degree murder, a first degree murder, or a special circumstance. The distinguishing factor is the defendant's mental state. Like a murder by means of torture or lying in wait, a murder by means of poison is first degree murder when evidence of how the defendant carried out the poisoning demonstrates a mental state that is "the functional equivalent of proof of premeditation, deliberation and intent to kill." (*Ruiz, supra,* 44 Cal.3d at p. 614; see *Sanchez, supra,* 24 Cal. at p. 29 [in context of poison, lying in wait, and torture, the means used provide "conclusive evidence of premeditation"]; *Steger, supra,* 16 Cal.3d at p. 546 ["same proof of deliberation and premeditation" required for torture murder as "for other types of first degree murder"].) The use of poison, standing alone, does not fulfill this requirement unless it is carried out with a state of mind more culpable than the malice required for a second degree murder conviction, i.e., more culpable than either (a) intending to kill the victim without premeditation and deliberation (i.e., express malice), or (b) intentionally giving the victim poison knowing that doing so was dangerous to human life and with conscious disregard for human life (i.e., implied malice). While no separate showing of premeditated intent to kill is required for first degree murder by poison (*Jennings, supra,* 50 Cal.4th at pp. 639–640), the poisoning nevertheless must be carried out with a mental state more culpable than malice.

We now clarify that to prove a murder by poison is in the first degree, the prosecution must show that the defendant

poison," proof of premeditated and deliberate intent to kill is not required].)

deliberately[10] gave the victim poison with the intent to kill the victim or inflict injury likely to cause the victim's death.[11] Reading this requirement into "murder . . . by means of poison" (§ 189, subd. (a)) ensures that a first degree poison murder is equivalent in turpitude to a willful, deliberate, and premeditated killing, without calling into question our prior cases holding that the prosecution need not separately prove premeditated intent to kill.[12] As discussed, the fact that the defendant killed the victim with poison is not alone dispositive. Instead, it is the defendant's mental state in giving the victim the poison that determines whether the act is murder and if so, whether the murder is in the first or second degree. A murder carried out by deliberately giving the victim poison with the intent to kill the victim or inflict injury likely to

---

[10] In this context, "deliberately" means carefully weighing the considerations for and against a choice and, knowing the consequences, deciding to act. (See CALCRIM No. 521.)

[11] Brown proposes we hold that first degree poison murder "requires proof that defendant willfully, deliberately, and with premeditation administered the poison" to the victim. This does not quite capture the Legislature's intent in designating poison murder as murder in the first degree. A poison may be given willfully, deliberately, and with premeditation with an intent to sicken, injure, or intoxicate the victim, or even with benign intent. (*Blair*, *supra*, 36 Cal.4th at p. 745; *Mattison*, *supra*, 4 Cal.3d at p. 183.) It is the defendant's deliberately giving the victim the substance with the intent to kill the victim or inflict injury likely to cause the victim's death that makes a poison murder equivalent in its "degree of atrociousness" to a premeditated murder. (Code commrs., note foll., Ann. Pen. Code, § 189, *supra*, at p. 82; *Milton*, *supra*, 145 Cal. at pp. 170–171; *Sanchez*, *supra*, 24 Cal. at p. 29.)

[12] Proof that the defendant deliberately gave the victim poison with intent to kill is *sufficient*, though not necessary (deliberately giving the victim the poison with the intent to inflict injury likely to cause the victim's death would also be sufficient), to elevate a murder to the first degree.

cause the victim's death is more "cruel and aggravated" than other "malicious or intentional killing[s]" both because such a killing involves preparation and planning and because the killer intentionally deprives the victim of any chance of escape or self-defense. (*Sanchez*, *supra*, 24 Cal. at pp. 29, 28; *id.* at p. 30; see *Catlin*, *supra*, 26 Cal.4th at p. 159 ["The poisoner acts surreptitiously, thus avoiding detection and defeating any chance at self-defense, and often betrays the most intimate trust"]; cf. 4 Blackstone Commentaries 196 ["Of all species of deaths the most detestable is that of poison; because it can of all others be the least prevented either by manhood or forethought"].) Such calculated, deliberate murders are both "more deplorable than others" and more easily "prevented than others by the deterrent effect of severe penalties." (*Steger*, *supra*, 16 Cal.3d at p. 545.) It is these characteristics that the Legislature had in mind when it designated murder by means of poison as a kind of first degree murder, for which the only punishment at the time was death. (*See* Code commrs., note foll., Ann. Pen. Code, § 189, *supra*, at p. 82 [division of murder into degrees based on "manifest injustice" of imposing death penalty in cases that "differed greatly from each other in the degree of atrociousness"].) A first degree murder conviction based on the mere "use of poison," without proof of a mental state more culpable than malice, would "result in criminal liability out of all proportion to the 'turpitude of the offender.' " (*Mattison*, *supra*, 4 Cal.3d at p. 186, italics omitted.)

While the trial court's instructions required the jury to find Brown acted with implied malice, they did not require the jury to find that Brown acted with any specific, heightened mental state in feeding Dae-Lynn her breast milk. The instructions thus allowed the jury to convict Brown of first degree murder without finding she deliberately gave her newborn daughter poison with

the intent to kill her or inflict injury likely to cause her death. Indeed, they permitted the jury to convict Brown of first degree murder even if it believed Brown fed her baby the breast milk with the intent to bond with her, nourish her, treat her illness, or soothe her. Such a conviction would not reflect a jury finding that, in giving the victim the poison, the defendant acted with the "calculated deliberation" or "cold-blooded intent" we require to elevate a murder to the first degree. (*Steger*, *supra*, 16 Cal.3d at p. 546.)

Accordingly, we conclude that the trial court was required to instruct the jury that to find Brown guilty of first degree murder, it had to find that she deliberately gave her newborn daughter poison with the intent to kill her or inflict injury likely to cause her death. Its failure to so instruct was error.

## B. Prejudice

The omission of an element of an offense from a jury instruction violates "the right to a jury trial under the Sixth Amendment to the United States Constitution" by depriving the defendant of "a jury properly instructed in the relevant law." (*In re Martinez* (2017) 3 Cal.5th 1216, 1224; see *Neder v. United States* (1999) 527 U.S. 1, 12 (*Neder*).) Having found such an error, we must "examin[e] the entire cause, including the evidence, and consider[] all relevant circumstances." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13 (*Aledamat*).) Unless, based on this examination, we conclude "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," we reverse the conviction. (*Chapman v. California* (1967) 386 U.S. 18, 24; see *Neder*, at p. 15.)

In a more typical murder by poison case, in which a defendant is alleged to have surreptitiously put arsenic in candy, cyanide in

vitamin capsules, or strychnine in a glass of milk, the record is likely to supply overwhelming evidence that the defendant deliberately gave the victim poison and did so, if not with the intent to kill the victim, then at least with the intent to inflict injury likely to cause the victim's death. (See, e.g., *Albertson, supra,* 23 Cal.2d 550; *Blair, supra,* 36 Cal.4th at pp. 745–746; *Cobler, supra,* 2 Cal.App.2d at pp. 377–379.) In this more typical fact pattern, this mental state element also is likely to be uncontested, such that if a trial court has omitted it from the first degree murder instruction, we may conclude "beyond a reasonable doubt . . . that the jury verdict would have been the same absent the error." (*Neder, supra,* 527 U.S. at p. 17; see *People v. Mil* (2012) 53 Cal.4th 400, 417 [missing element error "is harmless when 'the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . .' "].)

This case, however, is different. Based on the record here, a rational jury — if properly instructed — could have concluded the prosecution had not met its burden to prove that Brown deliberately gave her newborn daughter poison. (See *Neder, supra,* 527 U.S. at p. 19.) A rational jury could have given credence to Brown's statement that the thought of feeding her daughter drugs via her breast milk had never "even come across [her] mind." Moreover, evidence in the record would allow a rational jury to conclude the prosecution had not met its burden to prove that Brown fed her daughter her breast milk with the intent to kill her or to inflict injury on her that was likely to cause her death. In response to questions from the police investigator about the cause of Dae-Lynn's death, Brown expressed her love for her daughter and her excitement about being a mom. And when the investigator told Brown the autopsy report showed that drugs caused her

daughter's death, she responded: "[T]hat . . . kills me because I was only trying to help her. I didn't wanna try to harm my daughter at all. I never would intentionally." Evidence that Brown was afraid authorities would take her newborn daughter from her and that she tried to save her daughter's life by summoning help and administering CPR could also support a reasonable doubt as to whether Brown intended to kill her daughter or to injure her in a way likely to cause her death.

Indeed, the prosecutor did not argue Brown intended to kill or even harm her daughter. Instead, her closing argument focused the jury's attention on Brown's failure to perform her parental duties by taking illegal drugs while pregnant, failing to get prenatal care, giving birth in a hotel room without proper medical assistance, failing to take her baby to the doctor immediately after birth, failing to take her baby to the doctor when she began to suspect her baby was showing symptoms of withdrawal, and feeding her baby her breast milk after smoking methamphetamine and heroin. Addressing Brown's mental state in administering the poison, the prosecutor argued that "the only difference between first degree and second degree is that first degree requires . . . the People prove the murder was done by using poison." At the conclusion of her argument, the prosecutor emphasized that "you can still love someone but act intentionally and prove that you are acting intentionally because you repeat the behavior, knowing the consequences are dangerous to human life, knowing them because you are a drug user. You are an addict yourself. Performing them with knowledge that this is going to be dangerous and repeating them over and over again. You can still do all of that and love the person that you are doing them to. It's one of the horrible parts about being a human being. And that's exactly what she did in this

case. And she did it by introducing poison into her daughter's system."

The Attorney General contends any instructional error was harmless because, in his view, the evidence at trial established that Brown knew the drugs she was taking would pass into her breast milk, but she still intentionally fed her baby the breast milk. The Attorney General's argument is based on a misconception of our task. In assessing prejudice in this context, the question is not whether there is evidence in the record that would support a jury finding of the missing element. Instead, we ask whether we can conclude beyond a reasonable doubt that "the jury verdict would have been the same" had the jury been instructed on the missing element. (*Neder*, *supra*, 527 U.S. at p. 17.) If "the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element," the error is prejudicial. (*Id.* at p. 19.) The Attorney General's argument also is based on an incorrect understanding of the omitted element. As we have clarified, administering poison with malice only supports a conviction of second degree murder; for first degree murder, the prosecution must show the defendant deliberately gave the victim the poison with the intent to kill the victim or inflict injury likely to cause death. The Attorney General's contention that Brown knew the drugs she was taking would pass into her breast milk and intentionally fed her baby the breast milk despite this knowledge fails to address the central question: whether Brown deliberately gave the drugs to her baby with the intent to kill her or inflict injury on her likely to cause her death.

On this record, we cannot conclude beyond a reasonable doubt that the jury would have found Brown guilty of first degree murder had it been instructed that to do so, it had to find that she deliberately gave her newborn daughter poison with the intent to

kill her or inflict injury likely to cause her death.  The omission of this element from the jury instructions was prejudicial.

## III.  CONCLUSION

Because the trial court failed to instruct the jury on the mental state element of first degree murder by poison and because this error was prejudicial, we reverse the judgment.  We remand to the Court of Appeal with directions to return the case to the superior court for further proceedings consistent with our opinion.[13]

---

[13]    On remand, the superior court shall consider the potential applicability of recent sentencing reforms, including Assembly Bill No. 518 (2021–2022 Reg. Sess.) and Senate Bill No. 567 (2021–2022 Reg. Sess.).  (§§ 654, subd. (a), 1170, subd. (b)(6).)  Our disposition leaves intact Brown's conviction of child abuse (§ 237A) with an enhancement for willful harm or injury resulting in the death of a child (§ 12022.95), along with her convictions of possession of a controlled substance for sale (Health & Safety Code, § 11351) and possession of marijuana for sale (*id.* § 11359, subd. (b)).  The parties debate whether there is a legal basis for the trial court to accept a reduction of the first degree murder conviction to second degree murder if the prosecution decides not to retry the first degree murder charge.  (See *Steger, supra,* 16 Cal.3d at p. 553; *Chiu, supra,* 59 Cal.4th at p. 168.)  We express no view on this question.

GROBAN, J.

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**CANTIL-SAKAUYE, J.**[*]

---

[*] Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Brown

———————————————————————————————————————

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 7/16/19 – 3d Dist.
**Rehearing Granted**

———————————————————————————————————————

**Opinion No.** S257631
**Date Filed:**  March 2, 2023

———————————————————————————————————————

**Court:**  Superior
**County:**  Shasta
**Judge:**  Stephen H. Baker

———————————————————————————————————————

**Counsel:**

David L. Polsky, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, R. Todd Marshall, Catherine Chatman, Christopher J. Rench, Rachelle A. Newcomb, A. Kay Lauterbach and Cameron M. Goodman, Deputy Attorneys General, for Plaintiff and Respondent.

Keiter Appellate Law and Mitchell Keiter for Amicus Populi as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David L. Polsky
Attorney at Law
P.O. Box 118
Ashford, CT 06278
(860) 429-5556

Cameron M. Goodman
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 210-6330